# IN THE UNITED STATES DISTRICT COURT FOR THE

# SOUTHERN DISTRICT OF MISSISSIPPI

# SOUTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
JUN 06 2025
ARTHUR JOHNSTON
BY _____ DEPUTY

| | |
|---|---|
| YURI PETRINI, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | |
| CITY OF BILOXI, MISSISSIPPI; | ) |
| JEFF HARBOR, **individually;** | ) |
| JENNIFER POLK, **individually;** | ) |
| MANDY HORNSBY, **individually;** | ) |
| TARA BUSBY, **individually; and** | ) |
| JOHN/JANE DOES 1-20, | ) |
| | |
| Defendants. | ) |
| _____ | ) |

Civil Action No. 1:25CV178 LG-RPM

**JURY TRIAL DEMANDED**

**COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS**

Plaintiff Yuri Petrini, proceeding pro se, for his Complaint against Defendants, alleges as follows:

I. INTRODUCTION

1.  This case involves systematic harassment by City building officials who: o Destroyed official documents when threatened with legal action o Issued stop work orders without citing any code violations o Stated Plaintiff "won't shut up" - proving retaliatory motive o Ignored ADA accommodation requests for neurological disability o Caused construction loan default through 6+ months of delays

2.  Plaintiff faces irreparable harm: construction loan will report to collections within 30 days.

3.  See Kennedy v. City of Biloxi, No. 1:15-cv-00348-HSO-JCG, ECF 23 (S.D. Miss. Mar. 7, 2016) (retaining jurisdiction for three years). In Kennedy, this Court required Biloxi to overhaul systemic practices that violated due-process rights—demonstrating both (i) this Court's established practice of ordering comprehensive reforms when systematic violations are shown and (ii) the City's prior acceptance of such court-supervised remedies.

4.  Plaintiff brings this action against only those defendants whose personal animus is unmistakable—Harbor's destruction of evidence and statement that Plaintiff "won't shut up," Polk's shifting justifications and false application of law, Hornsby's retaliation for

2

refusing her aesthetic demands, and Busby's physical seizure of equipment—all demonstrate clear individual malice beyond mere enforcement discretion.

5.  The right to petition government for redress of grievances is not merely a constitutional provision—it is the very hallmark of American democracy, distinguishing our system from authoritarian regimes. It is what makes America, America. Yet as the record demonstrates, Defendants have systematically denied Plaintiff this fundamental right through a calculated campaign of willful silence, forcing him to endure financial hemorrhaging and temporal exhaustion while they rest on their own agenda. When government officials conspire to close their eyes and ears to citizen grievances—choosing silence over service, agenda over accountability—they strike at the heart of our constitutional order.

6.  It is in this spirit—and with full recognition of the gravity of personal capacity claims—that Plaintiff brings this action against Harbor, Polk, Hornsby, and Busby as individuals. Discovery will reveal the participation—or not—of higher-ups and other Does in this coordinated campaign. Notably, these four individual defendants represent distinctly different sectors of the municipal body: Harbor as Building Inspector for the Building Department, Polk as Plan Reviewer/highest permitting official, Hornsby as Historical Administrator under Community Development, and Busby as Code Enforcement Manager. In spirit and hierarchy, these positions are horizontal and should operate independently—each serving as a check against the others' potential overreach. In practice, however, they function as a tightly coordinated mechanism mounted to weaponize every angle their positions afford in service of hidden agendas. Where

3

citizens should find multiple avenues for fair treatment, they instead face a multi-headed

hydra: Polk blocks permits, Harbor enforces her blocks with invalid stop work orders,

Hornsby imposes arbitrary aesthetic requirements, and Busby physically seizes property.

Each attack comes from a different angle, through a different department, under

different authority—yet all march in suspicious synchronization. This transformation of

horizontal governance into vertical harassment represents not mere administrative

failure but deliberate architectural corruption of municipal structure itself. II.

JURISDICTION AND VENUE

7.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and §

    1343 (civil rights), as this action arises under the United States Constitution and 42 U.S.C.

    § 1983.

8.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth, and

    Fourteenth Amendments to the United States Constitution, and the Americans with

    Disabilities Act, 42 U.S.C. § 12132.

9.  This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

10. This Court has personal jurisdiction over all defendants who are Mississippi residents

    and/or committed tortious acts in Mississippi.

11. Venue is proper under 28 U.S.C. § 1391(b) as all events occurred in this district.

    Specifically, venue is proper in the Southern Division of this District where all events

    giving rise to this action occurred. III. PARTIES

12. Plaintiff notified the City of potential claims via written notice on June 3, 2025, pursuant to Miss. Code Ann. § 11-46-11. The City's failure to grant or deny the claim within 90 days, or issuance of this Complaint after 90 days, stays state law claims pending federal resolution.

13. Plaintiff Yuri Petrini: a) Is a property owner and business owner residing in Biloxi, Mississippi b) Has been recognized by the federal government under 8 U.S.C. § 1153(b)(2)(B) as possessing exceptional ability in business whose work serves the national interest c) Relocated from Miami to Biloxi specifically to reduce stress and improve health d) Holds professional licenses in multiple trades: building, electrical, mechanical, and plumbing e) Licensed by both State of Mississippi and City of Biloxi f) Has documented permanent neurological condition (narcolepsy, ICD-10 code G47.419) qualifying as disability under ADA g) Stress and confrontation can trigger life-threatening narcoleptic episodes h) Submitted medical documentation to City in previous communications to mayor's office requesting specific accommodations i) Currently has over $500,000 in materials and machinery sitting idle due to Defendants' actions

14. Defendant City of Biloxi is a Mississippi municipality that: a) Operates under home rule charter b) Maintains building/code enforcement departments c) Acts through employees and agents d) Has customs, policies, and practices causing constitutional violations e) Is liable under Monell v. Dep't of Social Services, 436 U.S. 658 (1978)

15. Defendant Jeff Harbor, individually, is a City building inspector who: a) Acts under color
   of state law b) Resides in Mississippi c) Issued stop work orders without citing code
   violations d) Destroyed official documents e) Is sued in his individual capacity

16. Defendant Jennifer Polk, individually, is the City's highest-level permitting official who: a)
   Acts under color of state law b) Resides in Mississippi c) Issued baseless stop work orders
   and voided valid permits d) Demanded unnecessary engineering for prescriptive code
   methods e) Lacks engineering credentials yet overrides licensed engineers f) Is sued in
   her individual capacity

17. Defendant Mandy Hornsby, individually, is the City's Historical Administrator who: a)
   Acts under color of state law b) Resides in Mississippi c) Demanded historically
   inaccurate features on modern buildings d) Subjected only Plaintiff's invisible fence to
   historic review e) Admitted coordinating with Building Department leadership f) Is sued
   in her individual capacity

18. Defendant Tara Busby, individually, is the City's Code Enforcement Manager who: a) Acts
   under color of state law b) Resides in Mississippi c) Physically seized Plaintiff's $100,000
   excavator without warrant d) Issued stop work order for alleged sub-inch encroachment
   e) Is sued in her individual capacity

19. Defendants Does 1-20 are City employees who conspired with the named defendants in
   the pattern of harassment. Their identities will be revealed through discovery but are
   believed to include electrical and other officials who participated in the unconstitutional
   conduct. Harbor's May 30, 2025 statement that "people at the office were talking about

6

the pool" confirms coordinated action. IV. STATEMENT OF FACTS A. Plaintiff's Construction Projects

20. Plaintiff owns and develops multiple properties in Biloxi: a) 1606 Beach Boulevard, Biloxi, MS 39531 - residential construction for personal residence b) 929 Division Street, Biloxi, MS 39530 - mixed-use property with warehouse, comprised of 6 apartments, 6000 square feet metal warehouse, approx. 10.000 square feet of retail space c) 342 Rich Avenue, Biloxi, MS 39530 - renovation project (Sold) d) 264 McDonnell Avenue, Biloxi, MS 39530 - residential property B. December 2024 Stop Work Order - No Code Violations

21. On December 1, 2024, at approximately 2:30 PM, Harbor arrived at 1606 Beach Boulevard in a marked City vehicle.

22. Harbor issued a stop work order on Plaintiff's valid building permit, stating he was "unfamiliar with steel construction" - not citing any code violation.

23. When challenged, Harbor refused to: a) Review engineered plans on site b) Consult with licensed professionals present c) Cite specific code sections allegedly violated d) Provide due process before stopping work

24. This stop work order forced Plaintiff to: a) Dismiss contractors b) Leave valuable property incomplete c) Obtain multiple construction loan extensions d) Risk foreclosure proceedings C. January 2025 Evidence Destruction

7

25. On January 3, 2025, at approximately 8:00 AM, Harbor returned to 1606 Beach Boulevard with another individual.

26. Witnesses present: Andrew Harwell (licensed realtor) and licensed contractor.

27. Harbor accessed the property by walking through a neighbor's yard - not using the normal entrance.

28. Harbor accused Plaintiff of lying about delivering plans to the City, stating no plans existed.

29. When Plaintiff stated he would involve lawyers, Harbor: a) Physically grabbed the stop work order b) Ripped it up c) Threw pieces on the ground d) Claimed no stop work order existed

30. After destroying evidence, Harbor was shown proof that plans were properly submitted and acknowledged by City staff.

31. Harbor then left without addressing the destroyed stop work order or reinstating work authorization. D. May 30, 2025 Retaliatory Inspection

32. On May 30, 2025, Friday, at approximately 2:00 PM, Harbor arrived for inspection at 1606 Beach Boulevard.

33. Harbor issued a "COURTESY NOTICE OF REQUIRED CORRECTIONS" regarding pool/spa barriers.

34. Despite Plaintiff's documented ADA accommodations request, Harbor: a) Provided no advance notice of inspection b) Refused to allow Plaintiff to accompany him c) Made inspection unnecessarily confrontational

35. When Plaintiff attempted to explain code compliance, Harbor told Plaintiff's wife that Plaintiff "won't shut up."

36. Harbor admitted coordinated harassment, stating: "people at the office were talking about the pool."

37. Harbor failed to: a) Cite specific code sections for unlocked doors being "obstacles" b) Apply consistent standards (acknowledging gates as acceptable) c) Consider ADA accommodation needs d) Provide meaningful opportunity to be heard

38. At the end of the inspection, Harbor promised: "You have my word—I'll have an answer today, he would try his best."

39. Harbor never provided any response - not May 30, June 2, June 3, or June 4, 2025. E. Pattern of Citywide Harassment Across Multiple Properties

40. Beginning in May 2024 and continuing through the present, Plaintiff has been subjected to a coordinated campaign of harassment by multiple City employees across different departments, all acting under the direction or with the approval of Building Department leadership.

41. May 16, 2024 - Roof Replacement Blocked at 929 Division Street: a) Plaintiff obtained valid permit to replace roof after paying all required fees. The roof replacement became

9

necessary after utility infrastructure damage compromised the building's structural integrity. b) This wasn't a pending application—it was an issued permit creating vested property rights c) While roof removal was underway, Defendant Polk issued stop work order without warning or notice, effectively voiding the paid permit d) Code enforcement officer who placed order admitted having "no knowledge" of reason, stating only it was "on orders from the office" e) Only after voiding the permit did Polk's department call Terry Moran to verify engineering—a backwards sequence that proves bad faith f) When confronted, Polk claimed "permit language was not clear" despite permit explicitly stating "roof replacement" g) After Plaintiff challenged this excuse, Polk shifted justification to false claim that removing roof exceeded "50% of property's area" h) When Plaintiff correctly noted 50% rule applies to value not area, Polk threatened to demand expensive professional appraisal i) Polk then required complete engineered plans without citing any code section requiring them j) Property remains exposed to elements over one year later, with permit still not reinstated as of June 4, 2025

42. October 2024 - Warehouse Modernization Blocked at 929 Division Street: a) Plaintiff sought to install modern siding on warehouse in regional business zone b) Defendant Hornsby demanded 1860s-era architectural features c) When Plaintiff proposed contemporary design appropriate for warehouse, Hornsby stated on October 17, 2024 at 4:26 PM: "no matter what the zoning" the historic guidelines apply d) Hornsby admitted coordinating with Building Department leadership: "I confirmed it with Mr. Creel" (October 17, 2024) e) Despite Plaintiff explaining the property has "no inherent historical significance or elements" and is "zoned for regional business and intended for use as a

warehouse" (October 18, 2024), Hornsby demanded "faux windows with trim work" f) Hornsby provided examples of residential homes and dissimilar buildings as "guidance" for warehouse design g) Process became so oppressive Plaintiff had to hire third party to interface with Hornsby h) Only after third-party intermediary capitulated to "exactly what she wanted" - including historically inaccurate 1860s features never present on the site - could project proceed i) Timeline demonstrates retaliation: After initially collaborative relationship (March-July 2024 emails showing positive tone), Hornsby escalated demands following Plaintiff's October 18, 2024 criticism that forcing 1860s aesthetics on a modern warehouse was "neither authentic nor appropriate" j) When Plaintiff initially refused demands, Hornsby spoke in opposition at AHRC meeting, causing application to fail

43. March 28, 2025 - Excavator Seized at 1606 Beach Boulevard: a) Neighbors complained about alleged sub-inch driveway encroachment previously addressed by surveyors b) Defendant Busby arrived despite Plaintiff warning City not to get involved c) Same inspector from 929 Division incident issued stop work order without consulting property owner d) Despite Plaintiff providing survey evidence and warning of legal action via phone from New York, Busby proceeded e) Busby physically entered Plaintiff's excavator and affixed stop work order with tape f) Stop work order contained criminal penalties warning but cited no violations g) Only after Plaintiff contacted Building Official did City return to remove order h) Video evidence shows Busby asking Plaintiff's wife to unlock equipment for removal

11

44. June 3, 2025 - Electrical Service Blocked at 929 Division Warehouse: a) Plaintiff
requested electrical service for warehouse at 929 Division Street a.1) Defendant Busby,
despite being Code Enforcement Manager, was manning the Building Department
desk—illustrating the fluid departmental boundaries that enable coordinated
harassment b) Doe #4 (identified as Jeff, Electrical Inspector) blocked service citing an
open "exterior siding change" permit c) Inspector claimed siding permit prevented
electrical service - completely unrelated matters d) When Plaintiff confronted absurdity
asking "what does electrical have to do with building siding," Jeff immediately pivoted
and requested replacement of some electrical components, which was reasonable and
in accordance with law, to which Plaintiff agreed e) This exemplifies the pattern: City
employees begin with absurd, baseless denials—here commingling unrelated permits to
manufacture obstacles—then retreat to reasonable positions only after confrontation f)
The willingness to invoke any permit, from any timeframe, for any purpose shows they
go beyond normal enforcement into active obfuscation g) Plaintiff must fight through
arbitrary roadblocks before City employees do their actual jobs properly

45. June 3, 2025 - Invisible Fence Requires Historic Review at 929 Division Street: a) Same
day as electrical harassment, Hornsby demanded AHRC review for fence 150 feet inside
property and completely invisible from any public view b) Plaintiff's own visible fence at
property line installed in 2023 required no such review c) Other visible fences along
Division Street also exempted from AHRC review d) Only Plaintiff's INVISIBLE interior
fence subjected to historic review - clear evidence of discriminatory enforcement e)
Email stated "Mr. Jerry Creel, Director of Community Development, confirmed this

project will need review" (June 3, 2025, 11:42 AM) f) When challenged about this disparate treatment on June 4, 2025, Hornsby provided no explanation for why invisible features require review while visible ones don't g) Despite Plaintiff noting ADA accommodations needs and security issues (3 police calls in 3 months), City insisted on review h) Plaintiff detailed absurdity of reviewing invisible features while visible ones exempt i) Discovery will reveal disparate enforcement rates against Plaintiff compared to other property owners

46. June 4, 2025 - Protected Speech and Defendants' Retaliatory Silence: a) On June 4, 2025 at 10:35 AM, Plaintiff sent detailed email response to Hornsby, CC'd to Director Creel, challenging the AHRC review requirement b) Plaintiff engaged in protected First Amendment activity by: o Questioning legality of requiring historic review for invisible features o Documenting disparate treatment (visible fences exempt, invisible fence not) o Citing Section 23-2-4(G)(2)(d)(3) exemption for unsafe conditions o Noting police called to property "at least 3 times in 3 months" due to transient encampments o Referencing his ADA conditions making AHRC proceedings problematic o Requesting Mississippi Public Records Act disclosure o Stating "I reserve all rights to pursue appropriate legal remedies if this matter is not resolved promptly and in accordance with law against the city and or personnel in their personal capacities" c) Plaintiff gave 48-hour deadline for response with six specific requests: o The specific written authority for Hornsby's position and determinations o Clear explanation of the inconsistent application of AHRC review o Rational basis for regulating non-visible features o Documentation of which visible fences required AHRC review versus those that did not o

All internal communications under Mississippi Public Records Act o Alternatively, Building Official certification under Section 23-2-4(G)(2)(d)(3) for public safety d) Neither Hornsby nor Creel ever responded - not June 6, not June 7, not ever e) This willful silence after legal threat and CC to Director demonstrates retaliatory animus f) City's own ordinance provides exemption where "the Building Official certifies the activity is required by the public safety because of an unsafe or dangerous condition" - yet defendants refused to even acknowledge this option g) The failure to grant readily available security exemption while knowing of documented police incidents shows deliberate indifference to Plaintiff's safety

47. Pattern Demonstrates Municipal Custom and Practice: a) Five different City employees across Building, Code Enforcement, Electrical, and Historic departments b) Two properties systematically targeted with repeated enforcement actions c) Identical modus operandi: no valid code citations, shifting justifications, ignoring due process d) Employees consistently retreat only when confronted - showing they know their positions are baseless e) Citizens forced to fight for every basic right - permits, utilities, property use f) Multiple employees citing Building Department leadership's authority or confirmation g) Escalation after each time Plaintiff asserts legal rights h) Pattern of deliberate exhaustion - wearing down citizens through bureaucratic warfare i) Defendants' coordinated use of silence as weapon - multiple officials (Harbor, Hornsby) promising responses then deliberately withholding them to exhaust Plaintiff and force litigation j) Refusal to apply readily available exemptions (like security exception) when doing so would benefit Plaintiff - showing intent to harm rather than regulate k) The

horizontal integration across theoretically independent departments—Building

Inspection (Harbor), Plan Review (Polk), Historical Administration (Hornsby), and Code

Enforcement (Busby)—reveals deliberate weaponization of municipal structure. What

should be checks and balances instead operates as coordinated attack vectors, each

defendant striking from their unique angle of authority while marching to the same

hidden drumbeat l) Departmental boundaries dissolve when harassment is the goal:

Code Enforcement manages Building desks, Electrical inspectors invoke building permits,

Historical administrators speak at regulatory meetings—each crossing lanes to maximize

obstruction m) The commingling of old permits with new requests, unrelated matters

with current applications, shows deliberate obfuscation rather than mere confusion—

they know exactly what they're doing n) The City's tolerance of Polk—without

engineering credentials—overriding licensed engineers' decisions while employing its

own Professional Engineer reveals institutional choice to enable harassment over

legitimate regulation o) When plan reviewers become shadow engineers, when personal

approval replaces professional standards, the permitting process becomes a weapon

rather than a tool p) The systematic failure to share approved plans between

departments reveals deliberate design—creating endless loops where citizens must re-

prove the same approvals to each new official q) Forcing engineering for simple

prescriptive methods (concrete leveling, fences, cantilevers within IRC limits) then losing

or ignoring the engineering demonstrates the true purpose: not safety but harassment r)

The City's treatment of citizens as servants who exist to satisfy officials' wishes—rather

than as residents to be served—pervades every interaction from Polk's unauthorized

engineering reviews to inspectors' claimed ignorance of approved plans s) The practice

of verifying submitted engineering (calling Terry Moran) then ignoring the verification

proves requirements are pretextual—if legitimate engineering satisfied legitimate

concerns, verification would lead to approval, not continued obstruction

48. Life-Threatening Impact on Plaintiff's Disability: a) Plaintiff suffers from narcolepsy

(G47.419), a serious neurological condition where stress can trigger dangerous episodes

b) Defendants' pattern of forcing confrontations before providing basic services literally

endangers Plaintiff's life c) Each forced confrontation - from Harbor's 8am ambush to

fighting for electrical service - risks triggering medical emergency d) City aware of

condition through prior ADA accommodation requests but deliberately continues stress-

inducing harassment e) Pattern shows deliberate indifference to risk of serious bodily

harm or death f) Recent stress-induced vision problems requiring medical intervention

and steroid treatment g) Medical providers have linked conditions to ongoing

harassment F. Pattern of Forcing Unnecessary Engineered Plans Despite IRC Prescriptive

Methods

49. The International Residential Code (IRC) establishes two distinct paths for code

compliance: prescriptive methods and engineered design. Prescriptive methods provide

pre-approved, code-compliant construction details for common residential elements.

When construction follows these prescriptive provisions, no additional engineering is

required because the IRC itself represents accepted engineering practice.

50. IRC Section R104.11 explicitly states: "The provisions of this code are not intended to prevent the installation of any material or to prohibit any design or method of construction not specifically prescribed by this code." This provision confirms that code-compliant construction need not match approved plans exactly, as long as it meets or exceeds code requirements.

51. Despite clear IRC provisions, Defendants have systematically forced Plaintiff to obtain expensive engineered plans for construction elements that comply with IRC prescriptive methods: a) May 16, 2024 - 929 Division Street Roof (Jennifer Polk): • Plaintiff obtained valid permit for roof replacement after paying all required permit fees • Permit was issued in good faith by the City, creating vested property rights • Work complied with IRC prescriptive framing requirements • While work was underway, Polk issued stop work order WITHOUT WARNING, effectively voiding the legally binding permit • Polk demanded engineered plans without citing any code section requiring them • Only AFTER destroying Plaintiff's permit rights did Defendants take the proactive step of personally calling engineer Terry Moran to verify his involvement • Mr. Moran confirmed his engineering work on the 929 Division project • Despite this post-hoc verification, Defendants made no effort to restore the permit they had wrongfully voided • This sequence—void first, verify later, never restore—proves both the pretextual nature and malicious intent • 13+ months later, the paid permit remains void despite Defendants independently confirming engineering authenticity • Property remains exposed to elements with no legal ability to complete permitted work b) 1606 Beach Boulevard - Cantilever Balcony (Bob/Jennifer): • IRC Section R502.3.3 provides prescriptive details

17

for cantilevers up to 24 inches • Plaintiff's design fell within prescriptive limits •
Defendants demanded stamped engineered drawings anyway • Engineering provided,
yet inspectors claimed no knowledge of approved plans • Plaintiff forced to repeatedly
"prove" engineering approval to different inspectors c) 342 Rich Avenue - Concrete
Leveling: • Plaintiff simply leveled concrete between two areas—a minor modification
with established prescriptive methods • Despite simplicity of pouring concrete to match
existing levels, engineering demanded • No structural implications, yet treated as major
structural modification • Stop work order issued demanding engineered drawings • No
code section cited requiring engineering for minor concrete work d) 264 McDonnell
Avenue - Fence Construction: • Standard fence construction covered by prescriptive
methods • Engineering demanded for basic fence despite no code requirement •
Demanded plans and inspections specifically for fence construction • When Plaintiff
attempted to schedule required fence inspections, Patty, a City employee with over 20
years experience at the permit desk, stated "that's not a thing" and "she's never seen
this" • City demanded inspections that its own veteran staff confirmed do not exist •
Punished Plaintiff for seeking voluntary compliance assistance e) The Pattern of
Bureaucratic Limbo: • Engineering plans demanded at great expense are not shared
internally between departments • Inspectors routinely claim no knowledge of plans that
Polk approved • Citizens must carry copies and repeatedly "prove" approvals to each
new inspector • No effort made to maintain or communicate approved documentation
internally • The process reveals the true purpose: not compliance but exhaustion

18

52. Polk's unauthorized practice of engineering review demonstrates the arbitrary nature of City enforcement: a) Despite lacking engineering credentials or apparent formal technical education, Polk routinely questions stamped engineering plans b) She demands additional calculations and details from licensed Professional Engineers whose qualifications far exceed hers c) The City employs at least one licensed Professional Engineer who could review technical matters within their expertise d) Yet Polk—a plan reviewer without engineering authority—makes engineering judgments that override licensed professionals e) This transforms the permitting process from "does it meet code?" to "does it satisfy Polk?"—replacing objective standards with subjective whims f) Her questioning of engineering decisions she's unqualified to assess proves the process isn't about safety or compliance but about power and control g) When unqualified officials override qualified professionals, the rule of law yields to the rule of personality

53. The systemic failure to share approved plans internally reveals Defendants' true perspective: citizens exist to satisfy their wishes, not to be served: a) After forcing expensive engineering, the City loses, ignores, or refuses to share the plans internally b) Each inspector acts as if no prior approvals exist, forcing citizens to re-prove compliance c) Plaintiff has repeatedly brought copies of stamped, approved plans to inspections only to have inspectors claim ignorance d) The burden of maintaining and proving City approvals falls entirely on citizens e) This is not incompetence but design—a system architected to exhaust rather than enable f) When Harbor must "ask Bob" about basic code despite years as inspector, when approved plans vanish into limbo, when citizens become filing clerks for the City's own approvals, the relationship between government

19

and governed is inverted g) Citizens become supplicants who must satisfy each official's

personal interpretation, carrying their papers from department to department like

refugees seeking stamps of approval

54. The sequence of Polk's actions reveals constitutional violations at every step: a) Step 1:

Plaintiff pays fees and obtains valid permit—creating constitutionally protected property

interest b) Step 2: Polk voids this paid permit via stop work order without warning or

due process c) Step 3: Only AFTER destroying these property rights does Polk's

department call Terry Moran d) Step 4: Moran confirms his engineering involvement e)

Step 5: Despite verification, Polk refuses to restore the wrongfully voided permit f) This

"shoot first, ask questions later, ignore answers" approach violates every principle of due

process g) A permit is not a mere piece of paper—it represents paid-for rights to use

property h) When government takes money for permits then voids them without cause,

it commits both due process violations and unjust enrichment i) The fact that verification

occurred AFTER deprivation, not before, proves the stop work order was issued in bad

faith

55. This pattern reveals Defendants' fundamental misunderstanding of their authority under

IRC Section R104.1, which authorizes them only to "enforce the provisions of this code,"

not to create new requirements or demand engineering when prescriptive methods

apply.

56. Building officials' authority is limited by established legal principles: a) Nasierowski Bros.

v. City of Sterling Heights, 949 F.2d 890 (6th Cir. 1991) - Building officials' interpretations

must be reasonable, consistent, and not arbitrary or capricious b) The prescriptive

provisions represent pre-engineered solutions already deemed safe through the code

development process c) Officials cannot "un-approve" what the code has already

approved through prescriptive methods

57. Defendants' practice constitutes unconstitutional burden-shifting in violation of due

process: a) The City maintains an Engineering Department with a licensed Professional

Engineer on staff b) If City inspectors have uncertainties about code compliance, the

burden is on the City to resolve those uncertainties using its own resources c) The City

cannot shift its interpretive insecurities to citizens' wallets d) Most egregiously, when

Polk—lacking engineering credentials—questions licensed engineers' stamped plans, she

forces citizens to pay for additional engineering to satisfy her unqualified doubts e) This

is akin to a layperson demanding a surgeon redo an operation because they "don't like

how it looks"—expertise means nothing when personal approval is the true standard f)

Like requiring criminal defendants to pay for prosecution experts, forcing property

owners to hire engineers to satisfy inspectors' doubts violates fundamental fairness

58. This practice violates the unconstitutional conditions doctrine. See Nollan v. California

Coastal Commission, 483 U.S. 825 (1987); Dolan v. City of Tigard, 512 U.S. 374 (1994).

The City cannot condition permit approvals or inspections on citizens waiving their right

to rely on code-prescribed methods or paying for unnecessary professional services.

59. The economic impact is severe: a) Engineering costs for unnecessary requirements b)

Multiple properties affected: 929 Division, 1606 Beach, 342 Rich Avenue, 264 McDonnell

Avenue c) Delays while obtaining unnecessary engineering d) Additional delays when approved engineering goes into "limbo" e) Costs of repeatedly proving the same approvals to different officials f) Time lost carrying documentation between departments g) Pattern shows deliberate economic warfare through bureaucratic means—death by a thousand fees and delays

60. Harbor's admission that he must "ask Bob" about pool barriers, despite years as a plumbing inspector, exemplifies the City's practice of promoting unqualified inspectors who then force property owners to pay for engineering to compensate for the inspectors' ignorance. This incompetence compounds when approved plans aren't shared—Harbor doesn't know the code AND doesn't know what's been approved, creating double jeopardy for citizens who must educate inspectors on both law and their own department's decisions.

61. Under Wilcher v. Lincoln County Board of Supervisors, 243 So. 3d 177, 187 (Miss. 2018), Defendants' failure to follow mandatory IRC procedures constitutes "run-of-the-mill negligence," not protected discretionary acts. Forcing engineering when prescriptive methods apply is ministerial error, not policy judgment.

62. This pattern demonstrates: a) Deliberate misapplication of code to harass b) Economic coercion through unnecessary costs c) Abuse of discretion exceeding statutory authority d) Custom and practice of unconstitutional burden-shifting e) Weaponization of building codes as tools of retaliation f) Invention of non-existent requirements even their own staff doesn't recognize g) Punishment of good-faith compliance efforts

63. The 264 McDonnell Avenue incident exemplifies Defendants' bad faith enforcement. When a property owner proactively seeks a courtesy inspection – demonstrating good faith intent to comply - the appropriate response is guidance, not punishment. Instead, Defendants: a) Weaponized an honest mistake (permit confusion due to multiple properties) b) Issued immediate stop work order rather than allowing correction c) Invented inspection requirements unknown to their own 20-year veteran staff d) Created impossible compliance situation - demanding inspections that don't exist e) Punished voluntary compliance efforts, chilling future cooperation f) Demanded engineering for a simple fence despite prescriptive methods being sufficient g) Created a Kafkaesque scenario where citizens must obtain expensive approvals that then disappear into bureaucratic voids G. Additional Facts Supporting Claims

64. While this Complaint fully describes the actions of Jerry Creel and other City employees to establish the pattern of harassment necessary for municipal liability, Plaintiff has exercised restraint in initially naming only those individual defendants—Harbor, Polk, Hornsby, and Busby—whose conduct demonstrates clear personal animus, direct constitutional violations, and causation of immediate harm. The pattern of harassment described herein reveals both vertical coordination (from Director-level approval down to inspector enforcement) and horizontal coordination (across Building, Code Enforcement, Electrical, and Historic departments), establishing systematic constitutional violations throughout City government.

65. The decision to name Harbor, Polk, Hornsby, and Busby in their personal capacities reflects not vindictiveness but necessity. When officials violate rights so clearly

23

established that every American understands them—when they destroy documents like criminals avoiding prosecution, when they openly state citizens "won't shut up," when they ignore desperate pleas about medical conditions and safety threats—they act not as public servants but as personal sovereigns.

66. The constitutional violations documented herein transcend isolated incidents, revealing instead: a) Vertical Integration: From Director Creel's confirmations down through department heads (Polk) to field inspectors (Harbor), showing top-down coordination; b) Horizontal Integration: Building (Harbor), Permitting (Polk), Code Enforcement (Busby), Historical (Hornsby), and Electrical (Jeff) departments all participating in coordinated harassment; c) Temporal Persistence: Pattern spanning May 2024 through present, escalating despite complaints; d) Geographic Scope: Targeting Plaintiff across four separate properties throughout Biloxi; e) Procedural Uniformity: All using identical tactics—no code citations, shifting justifications, ignoring due process; f) Constitutional Violations at Scale: First Amendment retaliation, Due Process deprivations, Equal Protection denials, Fourth Amendment seizures, and ADA violations occurring systematically rather than accidentally.

67. The selection of these four defendants for initial naming reflects their representation of the corruption's breadth: Harbor (Building Inspector) for field-level enforcement, Polk (Plan Reviewer) for administrative blockade, Hornsby (Historical Administrator) for aesthetic weaponization, and Busby (Code Enforcement Manager) for physical intervention—each operating from different departmental silos yet acting in suspicious synchronization.

68. The pool barrier issue originated with Building Department under Polk's supervision, where Bob (who Harbor must "ask" about pool barriers) works. Polk, as highest-level permitting official, oversees the very department creating these arbitrary requirements, establishing her supervisory role in the conspiracy.

69. The cumulative effect of Defendants' conduct has been to effectively seize Plaintiff's properties without compensation. Through serial stop work orders, Plaintiff has been deprived of: a) 13+ months use of 929 Division (roof exposed) b) 6+ months use of 1606 Beach (construction halted) c) Ability to complete 342 Rich Avenue d) Right to improve 264 McDonnell e) Total economic value during these periods

70. This amounts to temporary total takings without due process or compensation, while still requiring Plaintiff to pay taxes, insurance, and loan payments on properties he cannot use.

71. The cruel irony of Defendants' harassment campaign cannot be overstated: a) Plaintiff relocated from Miami's high-stress environment specifically for health reasons b) Chose Biloxi believing smaller city would provide peaceful environment for managing narcolepsy c) Instead of finding refuge, encountered systematic persecution worse than any large city d) Defendants have transformed what should be routine permitting into life-threatening ordeals e) Recent vision problems and steroid treatment directly result from harassment in place meant for healing

72. Defendants' harassment campaign targets not merely a local builder, but a federally-recognized business leader of exceptional ability with documented economic impact: a)

The United States government, pursuant to 8 U.S.C. § 1153(b)(2)(B), determined Plaintiff possesses exceptional ability in business that serves the national interest b) This federal determination required extensive documentation of Plaintiff's extraordinary business achievements and economic contributions c) Plaintiff's past business activities were responsible for substantial direct interstate and international economic activity and many fold that amount indirectly d) In the years immediately before relocating to Mississippi in 2023, Plaintiff generated significant interstate and international sales - figures that Plaintiff is working to replicate and increase to flourish the local economy e) Current projects involve substantial materials and machinery sitting idle due to Defendants' interference, including exclusive contracts to bring into Mississippi: engineered shells, pools, helical piles, structural steel, engineered fiber cement boards, sintered stone, and water and fireproof insulation - hurricane-proof, cost-effective materials specifically selected to replace traditional wood construction while improving the economy and further developing the city that has adopted Plaintiff's family f) Plaintiff has demonstrable operations from the last 18 months involving suppliers and partners from several countries across 3 continents, all disrupted by Defendants' actions g) Defendants' actions directly frustrate federal policy recognizing exceptional business talent and interstate commerce h) Local officials are destroying what federal authorities determined benefits the entire nation, while simultaneously preventing Mississippi from receiving the economic benefits of these exclusive international supply contracts 72.1. The interstate and international commerce impact of Defendants' harassment is severe and immediate: a) Each stop work order disrupts supply chains spanning multiple

continents b) International suppliers question Mississippi's business environment when exclusive contracts cannot be fulfilled c) The engineered shells alone represent cutting-edge construction technology that would position Biloxi at the forefront of sustainable building practices d) Helical piles and structural steel shipments from overseas manufacturers sit in warehouses accumulating storage fees e) Sintered stone and engineered fiber cement boards - materials that would upgrade Mississippi's construction standards - deteriorate while awaiting installation f) Defendants have effectively erected trade barriers against interstate and international commerce through arbitrary local enforcement g) This pattern violates not only Plaintiff's rights but frustrates the Commerce Clause's purpose of preventing local interference with national economic interests 72.2. Defendants' actions directly undermine Congressional intent and public interest: a) Congress, through 8 U.S.C. § 1153(b)(2)(B), created pathways to attract foreign talent with exceptional abilities to develop American communities - the exact purpose Plaintiff serves b) Plaintiff specifically chose to develop the substandard Division Street area, bringing international investment and cutting-edge construction methods to revitalize a neglected corridor c) The hurricane-proof materials Plaintiff imports are critical for Gulf Coast resilience - engineered shells and fiber cement boards can withstand Category 5 hurricanes while costing less than traditional wood construction d) By blocking these materials, Defendants force Mississippi residents to rebuild with outdated, hurricane-vulnerable methods, directly contradicting federal disaster resilience policies e) The public interest demands encouraging developers who bring:

- Hurricane-resistant construction to storm-prone areas

- Cost-effective alternatives reducing housing costs

- International investment to substandard neighborhoods

- Advanced building technologies creating local jobs

- Federal talent program participants fulfilling their purpose f) Instead, Defendants' harassment sends a chilling message to other international investors and federal talent program participants: Mississippi will punish you for bringing innovation g) This frustrates Congressional efforts to strengthen America through selective immigration of exceptional business talent, while leaving Mississippi vulnerable to future hurricanes and economic stagnation H. Financial Damages and Imminent Loan Default

73. Financial harm and imminent loan default: a) 1606 Beach: Multiple months of lost use and rental income b) Significant contractor cancellation costs c) Substantial construction loan extension fees and excess interest d) Plaintiff's construction loan with Cadence Bank, having required several extensions due to project delays caused by Defendant Harbor's December 1, 2024 stop work order, expired May 14, 2025 e) Despite passing all final inspections, Defendants' ongoing harassment prevents issuance of the Certificate of Occupancy required to convert to permanent financing f) Without this conversion, the construction loan will report to collections within 30 days of the bank's June 2, 2025 final notice, destroying Plaintiff's credit for seven years

74. Direct Causation of Financial Crisis: a) But for Harbor's baseless December 1, 2024 stop work order, construction would have completed within original loan term b) The stop work order forced dismissal of contractors and halted all progress c) Multiple loan extensions became necessary solely due to Defendants' interference d) As of June 2, 2025, Plaintiff has passed all final inspections and qualifies for Temporary Certificate of Occupancy e) Only Defendants' continued harassment prevents the administrative act of CO issuance f) Cadence Bank has explicitly warned that without CO for permanent financing conversion, collections reporting is imminent I. Additional Violations

75. Plaintiff has repeatedly exercised his constitutional right to petition for redress—the very right that defines American democracy—through: a) Ethics complaints about Harbor b) Appeals to city council members c) Written ADA accommodation requests d) Complaints to state regulators e) Direct requests to Harbor (May 30) f) Text message follow-up (June 4) g) June 4, 2025 formal written request to Hornsby citing security exemption with 48-hour response deadline

76. Yet Defendants, resting comfortably on their own agenda, have chosen deliberate blindness and calculated deafness to these petitions. Each unanswered plea represents not just administrative failure, but a fundamental betrayal of what makes America different—a government that must listen to its people.

77. Defendants engaged in willful silence designed to: a) Deny meaningful access to redress b) Force litigation as only option c) Demonstrate futility of administrative remedies d) Chill future petitioning activity e) Impose financial punishment through delay—knowing

each day costs Plaintiff money f) Rest comfortably on their predetermined agenda while Plaintiff's construction loans default g) Transform the constitutional right to petition into an empty ritual h) Conspire through coordinated non-response to break Plaintiff financially before he can vindicate his rights legally

78. This is not mere bureaucratic inefficiency—it is the deliberate weaponization of silence against the very constitutional right that distinguishes American democracy from tyranny.

VI. CLAIMS FOR RELIEF COUNT I - DUE PROCESS VIOLATIONS (42 U.S.C. § 1983) Against: Harbor, Polk, Busby, Hornsby, and City of Biloxi A. Procedural Due Process 79. Plaintiff incorporates Paragraphs 12-18 (parties and property interests), 20-23 (December stop work order), 41 (roof permit voidance), 43 (excavator seizure), 51(a) (Terry Moran verification), 69-70 (property seizure), 73-74 (financial harm). 80. Protected Property Interests: • Building permits for which Plaintiff paid fees (¶41(a)) • Vested rights in issued permits • Right to use $100,000 excavator (¶43(e)) • Right to complete authorized construction 81. Deprivations Without Due Process: • Harbor: Issued stop work order without citing code violations or providing hearing (¶¶21-22) • Polk: Voided paid roof permit without pre-deprivation process (¶41(c)) • Polk: Demanded engineering after voiding permit, then ignored verification (¶51(a)) • Busby: Seized excavator without warrant or hearing (¶43(e)) • Hornsby: Blocked permits through arbitrary historic requirements (¶42) 82. The voiding of paid permits constitutes a taking of two distinct property interests without just compensation: a) The permit fees paid to the City—taken without providing the permitted use b) The vested right to complete permitted work—destroyed without compensation When government sells a permit then voids it without cause, it commits

both theft and taking. 83. No Adequate Post-Deprivation Remedies: • Defendants' willful silence

to appeals (¶¶38, 45, 76-77) B. Substantive Due Process 84. Plaintiff incorporates Paragraphs

25-31 (evidence destruction), 48 (health impacts), 35 ("won't shut up"), 42(c) ("no matter what

zoning"). 85. Conscience-Shocking Conduct: • Harbor: Destroyed official stop work order when

threatened with lawyers (¶29) • Harbor: Accessed property through neighbor's yard for ambush

(¶27) • All Defendants: Deliberately endangered Plaintiff's health knowing of narcolepsy (¶48) •

Pattern designed to harm, not regulate (¶47) 86. No Legitimate Government Purpose: • No

code violations cited (¶¶22, 41(d)) • Shifting, pretextual justifications (¶41(f)-(i)) • Admission of

retaliatory motive (¶35)

Jeff Harbor's actions on December 10, 2024, confirm this punitive intent—he not only posted

the stop work order but manually underlined the already prominent "DO NOT" on the red paper

that already featured a stop sign image. This gratuitous emphasis on an already emphatic

document demonstrates that the primary purpose is to intimidate and demoralize rather than

communicate legitimate code concerns. Ironically, the only information provided on this

instrument of public shaming is the inspector's barely legible signature—no code sections, no

violation descriptions, no corrective instructions—transforming the document into a signed

piece of punitive art rather than a legitimate enforcement notice. The inspector autographs

their work like an artist claiming credit for a creation, yet refuses to specify what law was

allegedly violated. The City exercises this color of state law at its most coercive without the

extreme care and precision such power demands.

87. Qualified immunity is unavailable because the right to due process before property

deprivation was clearly established. Deville v. Marcantel, 567 F.3d 156, 170 (5th Cir.

2009) (pre-deprivation process required for property interests). No reasonable official could believe Harbor's or Polk's conduct lawful. Indeed, these rights are so fundamental that every American citizen—not just trained municipal officials—knows that government cannot take property without notice, hearing, and valid reason. Harbor's destruction of evidence and Polk's baseless stop work orders violate principles understood since before our Nation's founding. WHEREFORE, Plaintiff seeks compensatory and punitive damages against individual defendants, compensatory damages against the City, and injunctive relief. COUNT II - FIRST AMENDMENT VIOLATIONS (42 U.S.C. § 1983) Against: Harbor, Polk, Hornsby, and City of Biloxi A. Retaliation for Protected Speech

88. Plaintiff incorporates Paragraphs 29 (legal threats), 35 ("won't shut up"), 42(i) (aesthetic criticism), 46 (June 4 challenge).

89. Protected Speech: • Threatened legal action against Harbor (¶29) • Challenged stop work orders and code interpretations (¶41(f)) • Criticized forcing 1860s aesthetics on modern warehouse (¶42(i)) • June 4, 2025 formal challenge to Hornsby's authority (¶46(b))

90. Adverse Actions: o Harbor: Destroyed evidence immediately after legal threat (¶29) o Harbor: Stated Plaintiff "won't shut up" (¶35) o Polk: Escalated requirements after challenges (¶41(g)-(i)) o Hornsby: Spoke against Plaintiff at AHRC after aesthetic refusal (¶42(j)) o Hornsby: Complete silence after June 4 legal challenge (¶46(d))

91. Causation: o Temporal proximity between speech and retaliation o Harbor's admission of retaliatory motive (¶35) o Pattern of escalation after each instance of protected speech B. Violation of Right to Petition for Redress

92. Plaintiff incorporates Paragraphs 75-77 (petitions and silence), 46 (June 4 petition), 5 (fundamental right).

93. Petitioning Activity: o Ethics complaints about Harbor (¶75(a)) o Appeals to city council (¶75(b)) o ADA accommodation requests (¶75(c)) o June 4, 2025 detailed administrative request (¶46)

94. Denial Through Willful Silence: o Harbor: Promised response May 30, never provided (¶38-39) o Hornsby: Given 48-hour deadline June 4, never responded (¶46(c)-(d)) o Pattern of forcing litigation as only option (¶77)

95. Qualified immunity is unavailable because the right to be free from retaliation for protected speech was clearly established. Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002) (First Amendment prohibits retaliation for protected speech). No reasonable official could believe Harbor's, Polk's, or Hornsby's conduct lawful. Every American— from schoolchildren reciting the First Amendment to citizens attending town halls— understands that government cannot punish speech it dislikes. When Harbor destroyed evidence after legal threats, when Polk escalated enforcement after challenges, when Hornsby demanded silence or capitulation, they violated rights so basic that claiming ignorance insults both law and common sense. WHEREFORE, Plaintiff seeks compensatory and punitive damages against individual defendants, compensatory

damages against the City, and injunctive relief. COUNT III - EQUAL PROTECTION
VIOLATIONS (CLASS OF ONE) (42 U.S.C. § 1983) Against: All Defendants

96. Plaintiff incorporates Paragraphs 45 (fence disparate treatment), 47(q) (enforcement
pattern), 51 (engineering requirements).

97. Similarly Situated Comparators: o Other property owners with building permits o Other
owners of fences on Division Street (¶45(b)-(c)) o Other builders using prescriptive code
methods (¶51)

98. Intentional Different Treatment: o Plaintiff's invisible fence requires historic review;
visible fences exempt (¶45) o Engineering required for Plaintiff's prescriptive work; not
for others (¶49-63) o Multiple properties targeted while others left alone (¶47(b))

99. No Rational Basis: o Admitted personal animus: "won't shut up" (¶35) o Irrational
distinction: invisible features need review, visible don't (¶45) o Pattern reveals targeting,
not legitimate enforcement (¶47)

100.    Qualified immunity is unavailable because the right to equal protection was
clearly established. Shipp v. McMahon, 234 F.3d 907, 916 (5th Cir. 2000) (class-of-one
equal protection claims clearly established). No reasonable official could believe the
discriminatory conduct lawful. WHEREFORE, Plaintiff seeks compensatory and punitive
damages against all defendants and injunctive relief. COUNT IV - FOURTH AMENDMENT
UNREASONABLE SEIZURE (42 U.S.C. § 1983) Against: Busby and City of Biloxi

101.     Plaintiff incorporates Paragraphs 13(a) (property ownership), 43 (seizure incident).

102.     The Seizure: - March 28, 2025: Busby physically entered Plaintiff's $100,000 excavator (¶43(e)) - Affixed stop work order with tape, preventing use (¶43(e)) - No warrant, exigent circumstances, or valid enforcement purpose (¶43)

103.     Unreasonableness: - Based on alleged "sub-inch" encroachment (¶43(a)) - Ignored survey evidence and legal warnings (¶43(d)) - No immediate danger or legitimate purpose

104.     Qualified immunity is unavailable because the right to be free from unreasonable seizures was clearly established. Hogan v. Cunningham, 722 F.3d 725, 735 (5th Cir. 2013) (warrantless seizures presumptively unreasonable). No reasonable official could believe the conduct lawful. WHEREFORE, Plaintiff seeks compensatory and punitive damages against Busby, compensatory damages against the City, and injunctive relief. COUNT V - CONSPIRACY TO VIOLATE CIVIL RIGHTS (42 U.S.C. § 1983) Against: Harbor, Polk, Hornsby, Busby, and Does 1-20

105.     Plaintiff incorporates Paragraphs 36 (admission of coordination), 42(d) (Creel confirmation), 45(e) (Creel confirmation), 47 (pattern), 64-66 (coordination evidence).

106.     Agreement Evidence: - Harbor: "people at the office were talking about the pool" (¶36) - Hornsby: "I confirmed it with Mr. Creel" (¶42(d), 45(e)) - Cross-departmental coordination (¶44(a.1)) - Identical tactics across departments (¶47(e))

107.     Conspiratorial Objective: - Deprive Plaintiff of constitutional rights through coordinated harassment - Force Plaintiff out through bureaucratic warfare

108.     Overt Acts in Furtherance: - Serial stop work orders across properties - Busby manning Building desk during electrical denial (¶44(a.1)) - Verification of engineering followed by continued denial (¶51(a)) - Coordinated silence to force litigation (¶77) WHEREFORE, Plaintiff seeks compensatory and punitive damages against all conspirators. COUNT VI - ADA VIOLATIONS (42 U.S.C. § 12132) Against: City of Biloxi A. Failure to Accommodate

109.     Plaintiff incorporates Paragraphs 13(f)-(h) (disability), 48 (health impacts), 34 (confrontations), 75(c) (accommodation requests).

110.     Qualifying Disability: - Narcolepsy (ICD-10 G47.419) (¶13(f)) - Stress triggers life-threatening episodes (¶13(g)) - Documented with medical submissions (¶13(h))

111.     Accommodation Requests and Denials: - Requested written communications to avoid confrontations - Requested advance notice of inspections - City refused, forcing stressful confrontations (¶34) B. ADA Retaliation

112.     Protected Activity: - Submitted ADA accommodation requests (¶75(c))

113.     Retaliatory Actions: - Escalated harassment after accommodation requests - Harbor's "won't shut up" comment during forced confrontation (¶35) - Continued pattern despite knowing health risks (¶48)

114.     Plaintiff seeks compensatory damages only against the City under the ADA, as punitive damages are not available against municipalities under this statute.

WHEREFORE, Plaintiff seeks compensatory damages and injunctive relief requiring reasonable accommodations. COUNT VII - MUNICIPAL LIABILITY (MONELL) (42 U.S.C. § 1983) Against: City of Biloxi

115.     Plaintiff incorporates all violations in Counts I-VI, plus Paragraphs 47 (pattern), 64 (municipal custom), 66 (structural corruption).

116.     Constitutional Violations by City Employees: - All violations detailed in Counts I-VI above

117.     Municipal Policy/Custom/Practice: **a. Pattern of Constitutional Violations:**

- Five different departments participating (¶47(a))

- Multiple properties targeted systematically (¶47(b))

- Spanning May 2024 to present (¶40)

**b. Failure to Train/Supervise:**

- Harbor doesn't know basic code, must "ask Bob" (¶60)

- Promoted from plumbing to building inspector without training

- Polk questions engineering despite no credentials (¶52)

**c. Ratification by Policymakers:**

- Director Creel "confirmed" Hornsby's actions (¶42(d), 45(e))

- Polk as "highest-level permitting official" (¶16)

**d. Structural Corruption:**

- Horizontal departments weaponized vertically (¶66)

- Employees cross boundaries to maximize harm (¶44(a.1))

118.    Moving Force: - But for these customs/policies, violations wouldn't have occurred - Pattern too consistent to be individual rogue actions

119.    Deliberate Indifference: - Continued despite ethics complaints (¶75(a)) - Escalated after ADA accommodation requests (¶48) WHEREFORE, Plaintiff seeks compensatory damages and comprehensive injunctive relief including court-supervised reforms. [COUNTS VIII THROUGH XV - RESERVED FOR AMENDMENT] Plaintiff reserves the right to amend this Complaint to add state law claims and additional federal claims following discovery, as permitted by Fed. R. Civ. P. 15. Plaintiff has complied with the notice requirements of the Mississippi Tort Claims Act by providing written notice to the City on June 3, 2025. VII. DAMAGES

120.    As a direct and proximate result of Defendants' actions, Plaintiff suffered: a) Economic Damages: • Lost use and rental income from multiple properties • Construction loan extension fees and excess interest • Contractor cancellation and remobilization costs • Property damage from weather exposure • Unnecessary engineering and compliance costs • Carrying costs including mortgage, insurance, taxes, utilities • Lost business opportunities and damaged commercial relationships • Medical

treatment costs for stress-induced conditions • Imminent credit damage from loan default

**Total Economic Damages: Not less than $300,000**

b) Non-Economic Damages: • Severe emotional distress • Pain and suffering from medical deterioration • Loss of enjoyment of property • Amount to be determined by jury

c) Punitive Damages: • Against individual defendants Harbor, Polk, Hornsby, and Busby • For evidence destruction, deliberate indifference to disability, and abuse of power • Amount to be determined by jury

VIII. REMEDIES SOUGHT 121. Plaintiff respectfully requests this Court: A. Preliminary and Permanent Injunctive Relief Plaintiff will file a separate motion for temporary restraining order and preliminary injunction seeking immediate relief from ongoing constitutional violations. Upon final hearing, Plaintiff requests permanent injunctive relief including but not limited to:

1. Vacating all stop work orders issued without citation to specific code violations;

2. Ordering Defendants to process permits and certificates of occupancy according to uniform standards applied to all property owners;

3. Requiring reasonable accommodations for Plaintiff's documented disability;

4. Prohibiting retaliation and requiring timely responses to administrative requests;

5. Implementing court-supervised reforms similar to those in Kennedy v. City of Biloxi, No. 1:15-cv-00348-HSO-JCG, ECF 23 (S.D. Miss. Mar. 7, 2016);

6. All relief requested in contemporaneously filed motions. B. Declaratory Relief Declare Defendants' actions unconstitutional and their enforcement practices void. C. Compensatory Damages Award all economic and non-economic damages proven at trial, including but not limited to those itemized above. D. Punitive Damages Award punitive damages against individual defendants to deter future misconduct. The Court should award substantial punitive damages against each individual defendant to reflect that:

7. They violated rights so clearly established that every citizen understands them

8. Their actions shock the conscience of anyone who believes in American principles

9. Personal liability is necessary to deter future officials from similar tyranny

10. No immunity protects those who abandon basic human decency in pursuit of personal agenda E. Attorneys' Fees Award attorneys' fees under 42 U.S.C. § 1988. F. Other Relief Grant such other relief as the Court deems just and proper. IX. JURY DEMAND Plaintiff demands trial by jury on all claims so triable.

*WHEREFORE, Plaintiff respectfully requests that this Court grant the relief sought herein, including urgent relief necessary to prevent imminent and irreparable harm, and to vindicate the public interest in constitutional governance.*

**Respectfully submitted,**

Yuri Petrini

40

**VERIFICATION**

STATE OF MISSISSIPPI      )

                          )

ss.

 COUNTY OF HARRISON   )

                          I


declare under penalty of perjury that the foregoing is true and correct to the

best of my ability and knowledge. Executed on June 6, 2025.

Yuri Petrini - Plaintiff

41

## CERTIFICATE OF SERVICE

I hereby certify that on _____, 2025, I caused the foregoing Complaint to be filed with

the Clerk of Court for the United States District Court for the Southern District of Mississippi,

and that service will be accomplished upon all defendants in accordance with Fed. R. Civ. P. 4 as

follows:

City of Biloxi, Mississippi: Via certified mail, return receipt requested, and regular U.S. Mail to:

• Mayor of Biloxi City of Biloxi and/or City Clerk City of Biloxi

 140 Lameuse Street Biloxi, MS 39530

**Individual Defendants:**

Jeff Harbor, Jennifer Polk, Mandy Hornsby, and Tara Busby will be served via personal service

through a process server at their places of employment at the

City of Biloxi Building Department,

214 Lameuse Street,

Biloxi, MS 39530,

or at such other locations as may be determined through diligent inquiry. Doe Defendants 1-20:

To be served upon identification and joinder. I further certify that true and correct copies of this

Complaint and all exhibits will be provided to all parties upon request.

Yuri Petrini

929 Division St Biloxi, MS 39530   yuri@megalopolisms.com -

3055041323