# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# SOUTHERN DIVISION


SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

DEC 01 2025

ARTHUR JOHNSTON
BY_____ DEPUTY

*NO. 1:25-cv-00178-LG-RPM*

**YURI PETRINI and SUMIRE MAEDA,**
Plaintiffs,

v.

**CITY OF BILOXI, MISSISSIPPI; JERRY CREEL; JEFF HARBOR; JENNIFER POLK; TARA BUSBY; PETER C. ABIDE,; CURRIE JOHNSON & MYERS, P.A.,**
Defendants.

---

## SECOND AMENDED COMPLAINT PURSUANT TO 42 U.S.C. § 1983 FOR DAMAGES AND INJUNCTIVE RELIEF WITH JURY DEMAND

---

## I. PARTIES

1. **Plaintiffs.** Yuri Petrini and Sumire Maeda reside in Biloxi, Mississippi, and own property at 1606 Beach Boulevard, Biloxi, Mississippi 39530. Plaintiffs filed a Notice of Claim with the City of Biloxi pursuant to the Mississippi Tort Claims Act on June 2, 2025.

2. **Municipal Defendant.** The City of Biloxi is a Mississippi municipal corporation subject to suit under 42 U.S.C. § 1983.

3. **Individual Defendants.** Jerry Creel serves as Building Official and Director of Community Development for the City of Biloxi. Jeff Harbor serves as Chief Building Inspector for the City. Jennifer Polk serves as Plans Examiner for the City. Tara Busby serves as Code Enforcement Officer for the City. Each is sued in both individual and official capacities for acting under color of state law.

4. **City Attorney Defendants.** Peter C. Abide is sued in both individual and official capacities. Currie Johnson & Myers, P.A., City Attorney, is sued in its official capacity. Both serve as City Attorney pursuant to Resolution No. 327-17 and acted under color of state law.

---

## II. JURISDICTION AND VENUE

5. **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, this action arising under 42 U.S.C. § 1983 and the Fourteenth Amendment, with supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

6. **Personal Jurisdiction.** This Court has personal jurisdiction over Defendants, who reside and acted within this judicial district.

7. **Venue.** Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendants reside within this district and substantial part of events occurred here.

## III. PRELIMINARY STATEMENT

Plaintiffs initiated this action on June 6, 2025 seeking relief from constitutional violations including arbitrary enforcement actions and denial of Certificate of Occupancy despite passing all inspections on May 30, 2025. Rather than addressing merits or providing cure requirements, Defendants escalated retaliation. June 23, 2025 emergency motion denied, requiring administrative exhaustion. June 30, 2025 armed police delivered Stop Work Order fifty minutes after Plaintiffs filed FBI report. July 9, 2025 Plaintiff Sumire delivered 180 pages of engineering documentation while Plaintiff Yuri was incapacitated from surgery---same day Defendants filed criminal summons. July 10, 2025 Defendant Creel swore false affidavits claiming he "personally observed" Plaintiff Yuri at property when medical records prove Plaintiff was in California. July 11, 2025 attorney Ross hired Maddie Costelli Pettrey to manufacture engineering findings--- Pettrey later admitted Ross hired her, not Building Department, and she was prohibited from communicating with Plaintiff. July 25, 2025 municipal court arraignment, Defendant Creel made recorded admissions stating Plaintiff "bypassed us and filed federal lawsuit" and "flooded us with public records requests"; court issued cease and desist order without statutory authority despite Plaintiff's objections about constitutionality and federal court jurisdiction. August 7, 2025 Plaintiff emailed requesting pre-trial diversion details, copying all City Council members and Chief Administrative Officer---receiving no response---prosecutor secretly scheduled pre-trial without notice threatening automatic criminal docketing for non-appearance. August 8, 2025 scheduled pre-trial diversion canceled by Creel, who later admitted he never intended to hold it. September 19, 2025 municipal court dismissed criminal case without prejudice but perversely maintained Stop Work Order indefinitely, revealing criminal machinery was leverage rather than legitimate enforcement. September 30, 2025 conference before Magistrate Judge Myers, defense counsel admitted Defendants never provided written Certificate of Occupancy requirements. October 30, 2025 record demonstrates three independent Professional Engineer submissions confirming structural safety. Defendants face evidence documented through exhibits, recordings, videos establishing perjury, conspiracy, extortion, takings, public records fraud, court control,

Sunday surveillance, death notes left by inspectors, warrantless trespassing and interrogation of Plaintiff Sumire at business location resulting in ongoing State Department investigation. Consulting engineer Pettrey made on-record confessions, suddenly became designated expert witness, refused cost-free settlement requiring only one deposition---truthful testimony would expose Ross to criminal liability. Defendants in all actions failed to dispute facts, instead attempting reframe under fragile grounds including claim that Plaintiff and Judge Ready entered contract allowing prohibitions in dismissed case. Municipal Prosecutor Robert Harenski, who possessed colorable immunity claim, was first to settle---settlement confirms allegations.

This amended complaint addresses Defendants' procedural and technical objections raised in prior filings. Defendants seek dismissal on procedural grounds. Plaintiff, appearing pro se, respectfully cautions this Court that "pro se pleadings are to be liberally construed and held to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Federal courts interpret pro se complaints liberally, accepting allegations as true and construing them in plaintiff's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Substance prevails over form. Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice"). Where substantive constitutional violations are clear from pleadings and evidence, technical deficiencies cannot shield defendants from liability. This Court should evaluate claims on merits rather than permit defendants to escape accountability through procedural gamesmanship.

Plaintiff comes before this Court seeking declaratory judgment, nominal damages, and compensatory damages for actions surrounding denial of Certificate of Occupancy. Plaintiff seeks this Court enjoin discriminatory and illegal conduct by Defendants. Defendants requested this Court provide marshal presence at municipal court arraignment. Plaintiff, possessing no criminal history, submits that armed police deployment on multiple occasions, false criminal charges, Sunday surveillance, and death threat notes left on Building Department letterhead constitute conduct requiring law enforcement intervention---relief Plaintiff simultaneously pursues through parallel criminal complaints with federal and state authorities.

---

## IV. STATEMENT OF FACTS

### A. THE CONSTITUTIONAL VIOLATIONS

Defendants utilize stop work orders and police powers as they would hand pamphlets---without safeguards for due process, without notice requirements, without hearing opportunities, treating constitutional protections as administrative inconveniences rather than fundamental rights. The pattern across multiple properties and incidents reveals systematic disregard for procedural protections mandated by both the International Residential Code and the Fourteenth Amendment.

### 1. Property Deprivation Without Process (1606 Beach Boulevard)

8. **May 30, 2025:** Plans approved after extensive review requiring twenty iterations for deck and pool, including submissions addressing FEMA requirements, variance proceedings before Board of Zoning Appeals granting variance for front yard pool placement. All inspections passed---electrical, mechanical, plumbing, structural---showing no code violations. Inspector Harbor excluded Plaintiff Yuri Petrini from final inspection, told Plaintiff Sumire Maeda that Plaintiff Yuri "won't shut up and let me do my job," promised temporary Certificate of Occupancy by day's end, then disappeared. No CO issued. No written denial. No reasons given. Property remains uninsurable, unusable, worthless despite validation by three Professional Engineers. Plaintiff cannot recover equity through sale or refinancing. All Plaintiffs' properties in Biloxi face prohibitions by the enterprise---systematic obstruction preventing normal property transactions, financing, or commercial use. CO denial forced Plaintiffs to maintain two households at cost, causing severe financial strain on marital finances and family stability.

9. **June 13, 2025:** Court ordered administrative exhaustion. Four days later, receptionist Christy stated "not allowed to talk to you under orders of City Attorney Peter Abide." Creel would not answer calls. Polk refused communication. City Attorney Abide blocked all contact with Plaintiffs---eliminating the administrative remedies the Court ordered exhausted. Communication ban extended to Plaintiff Sumire Maeda despite her attempts to communicate on behalf of family property interests, forcing spouse to attempt administrative remedies after husband was blocked.

10. **June 27, 2025:** Plaintiff Sumire Maeda and insurance auditor Joevy met with Creel and Polk at Building Department. Plans Examiner Polk admitted to Plaintiff Sumire Maeda and insurance auditor Joevy that she "lost the December stamped plans and could not locate them." These plans had been delivered by licensed professional Andrew Harwell three times as City made multiple copy requirements while Plaintiff was abroad. December 2024 stop work order issued by Harbor without any information, then Harbor left for vacation. Inspector Robert met with engineer Terry Moran on site, agreed with proposed construction, inspected footings and helical piles, asserted what was required, and received the plans from Harwell. Defendant Creel later denied plans were ever submitted. Upon definitive proof of submission, Defendant Creel pivoted to claiming structure "not built as per the plans"---except it was built per plans, with any on-site adjustments made by the engineer within permit scope. When shown these plans on Plaintiff Sumire's phone, Polk confirmed "that's what she needs"---the plans demonstrating compliance. When Plaintiff Sumire attempted to submit completed Certificate of Occupancy application form---available on City's own website---both Polk and Creel denied her, falsely stating "an application is not required" despite form's existence. Creel present throughout Polk's admission, also questioned if Terry Moran was still the project engineer. Insurance auditor witnessed City's contradictory positions

firsthand. When provided engineered drawings proving compliance, Creel denied the structure met code without stating which code provisions were violated.

11. **June 30, 2025:** Stop Work Order delivered via armed police---unprecedented for code enforcement---citing IRC R114.2 but providing no "reasons for order" or "conditions under which work authorized to resume" as R114.2 mandates. Order stated only "call me to discuss"---yet Creel maintained the communication ban blocking both Plaintiffs. Plaintiff Sumire and family were present during armed police delivery, witnessing tactical deployment at family residence and experiencing severe trauma from armed confrontation. Armed tactical deployment created fear for family safety, particularly affecting Plaintiff Sumire's ability to feel safe in the family's own property.

12. **Result:** Property complete, inspections passed, plans validated by licensed engineers--- yet CO denied without reasons, without hearing, without opportunity to cure, and with all administrative channels blocked by City Attorney directive affecting both property co-owners.

## 2. Equipment Seizure Without Warrant (1606 Beach Boulevard)

13. **March 28, 2025:** Stop Work Order placed on excavator for alleged encroachment based on neighbor complaint. Complaining neighbor is friend of Defendant Creel and defendant in parallel litigation against Plaintiffs---conspiracy to deprive Plaintiffs of land use. No warrant. No hearing. No evidence review despite Plaintiffs providing two surveyor certifications. Code Enforcement Officer Busby refused to review survey evidence. Busby physically entered Plaintiffs' excavator---opened equipment door, entered interior cabin, affixed Stop Work Order with tape to interior surfaces despite exterior permit box ten feet away. No exigent circumstances. No consent to entry. Contractors left site after witnessing warrantless equipment entry and seizure. Equipment rendered inoperable for hours---Stop Work Order prevented operation until Creel released it. Creel required moving concrete forms without reviewing survey evidence from two licensed surveyors. Equipment released only after forced modifications reducing driveway from permitted width despite survey evidence proving compliance. Excavator constitutes marital property asset, affecting both Plaintiffs' property rights and family financial interests through forced construction modifications and contractor losses.

## 3. Harbor's December 2024 Stop Work Order (1606 Beach Boulevard)

14. **December 1, 2024:** Harbor issued stop work order stating he was "unfamiliar with steel construction." Cited no code violations. Refused to review engineered plans on site. Refused consulting professionals present. No pre-deprivation hearing. No notice. No stated reasons. Forced contractor dismissal mid-construction with majority of deck frame already erected.

15. **January 3, 2025:** When Plaintiff Yuri mentioned lawyers, Harbor grabbed the stop work order, ripped it up, threw pieces down, claimed no order existed. Three witnesses present: Andrew Harwell and another licensed contractor. After calling office and learning Creel confirmed "everything fine, plans delivered," Harbor apologized, authorized work resumption. Work resumed on identical deck frame---no plan changes required. Month delay cost substantial sums in labor, financing interest, and capital loss---affecting family finances, not just individual Plaintiff.

## B. THE RETALIATORY TIMELINE

16. **June 6, 2025:** Filed federal civil rights lawsuit (Case 1:25-cv-00178-LG-RPM).

17. **June 30, 2025, 2:17 PM:** Filed FBI report on death threats.

18. **June 30, 2025:** Armed police delivery of stop work order---first-ever use of tactical officers for code enforcement, occurring fifty minutes after FBI report. Maximum confrontation though IRC allows email, certified mail, or posting. Retaliation affected family unit, not just named Plaintiff. Armed tactical deployment caused severe emotional distress to Plaintiff Sumire and family members present during armed confrontation.

19. **July 2, 2025:** Sent settlement offer requesting meeting, proposing to cease litigation upon resolution. No response.

20. **July 7, 2025:** Emailed Creel informing him of eye surgery in California.

21. **July 9, 2025:** Plaintiff Sumire delivered 180 pages of documentation including as-built plans, structural calculations, and letter to address Defendants' concerns while Plaintiff Yuri was incapacitated from surgery---confirmed by Jerry Creel's July 10, 10:30 AM email. Criminal summons issued July 9---same day Plaintiff Sumire delivered compliance documentation. Defendants ignored compliance efforts and immediately criminalized family.

22. **July 10, 2025:** Creel filed four sworn criminal affidavits (Case CC-617-19) stating he "personally observed" Plaintiff Yuri Petrini at 1606 Beach Boulevard at 10:00 AM "installing swimming pool without permit," "building deck," and "occupying residence." Plaintiff Yuri was incapacitated from eye surgery in California, never left room until 4:00 PM. Criminal summons issued July 9---before supporting affidavits executed July 10.

23. **July 10, 2025, 10:30 AM:** Thirty minutes after allegedly witnessing violations, Creel emailed Plaintiff Yuri acknowledging receipt of Plaintiff Sumire's engineering package delivered July 9---no mention of any violations supposedly witnessed thirty minutes earlier. False criminal prosecution caused distress to family.

24. **July 20, 2025 (Sunday, 1:19 PM):** Creel contacted engineer Moran ordering cessation of hurricane preparedness measures---utilizing Plaintiffs' own engineer as Sunday messenger rather than communicating directly as court ordered. Earlier that Sunday, Creel surveilled the property for thirty minutes, filmed by Plaintiffs. When Moran informed Creel unsecured 1700-lb fiberglass pool shell posed public safety risk to Highway 90 traffic, Creel maintained prohibition despite manufacturer specifications warning cable restraints would fail in high winds.

25. **July 25, 2025:** Municipal court arraignment. Creel made retaliatory admissions preserved in audio recordings: Plaintiff "bypassed us and filed federal lawsuit" and "flooded us with public records requests." Prosecutor Harenski promised to be "very liberal with discovery."

26. **August 7, 2025:** Emailed Creel requesting pre-trial diversion details, copying all City Council members and Chief Administrative Officer---receiving no response.

27. **August 8, 2025:** Scheduled pre-trial diversion canceled by Creel, who later admitted he never intended to hold it.

28. **September 19, 2025:** Municipal court dismissed Case CC-617-19 without prejudice after prosecution failed to produce evidence despite discovery order. Dismissal order perversely maintained Stop Work Order indefinitely---revealing criminal machinery was leverage, not legitimate enforcement. Stop Work Order maintenance continues to deprive Plaintiffs of property rights.

---

## C. ABIDE'S FINANCIAL INCENTIVES & GATEKEEPING

29. Resolution No. 327-17 appoints Peter Abide as "primary contact for all City matters" with "authority to engage, supervise, and direct" special counsel, though explicitly stating Abide "shall not be considered an employee of the City." November 26, 2024 public records response disclosed $566,000 annual compensation from City contracts while assuming unauthorized records custodian role---blocking inspection records and denying public records requests as "fishing expedition for your federal case."

30. City Attorney compensation creates financial incentive to manufacture disputes and prolong litigation through obstruction. The more complex the dispute, the higher the billables.

31. **August 14, 2025:** Attorney gatekeeping text from Creel forced all building permit communications through attorney Hank Ross at $150/hour, converting municipal services into billable legal consultations. City pays Ross's fees, creating financial incentive to obstruct rather than facilitate services. Gatekeeping affected spouses' property rights, blocking direct access to Building Official for governmental services.

32. The principles underlying *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1990), prohibit permit conditions lacking essential nexus to legitimate governmental interests and rough proportionality to development impacts.

33. *Koontz v. St. Johns River Water Management District*, 570 U.S. 595, 607, 612 (2013), clarified these principles apply regardless of whether government structures demands as conditional approval or outright denial, and regardless of whether demands are monetary or for physical property dedication.

34. The attorney gatekeeping requirement fails constitutional scrutiny under all formulations. Whether characterized as conditional approval requiring attorney fees before Certificate issuance, outright denial unless attorney fees paid, or monetary exaction converting zero-cost services into billable consultations, the requirement lacks essential nexus to building safety and fails rough proportionality to any legitimate governmental interest.

35. The Supreme Court in *Nollan* condemned permit conditions lacking essential nexus as an "out-and-out plan of extortion." 483 U.S. at 837. The attorney gatekeeping requirement exhibits characteristics the Court identified: no relationship to legitimate safety interests, private financial benefit to attorneys extracting fees, and leverage over citizens seeking governmental services.

36. Constitutional exactions analysis proceeds sequentially. First, *Nollan* requires essential nexus between exaction and governmental purpose. Building safety bears no connection to attorney representation for routine permit communications. Second, even if nexus existed, *Dolan* requires rough proportionality between exaction burden and development impact. Converting free municipal service into $150-per-hour consultations is grossly disproportionate to any legitimate interest. Third, *Koontz* prevents evasion by applying framework regardless of demand structure. The requirement fails scrutiny independently and cumulatively at each analytical stage.

---

## D. ENGINEERING VALIDATION vs. DENIAL WITHOUT REASONS

37. Three Professional Engineers validated 1606 Beach Boulevard structure. PE Terry Moran delivered 160-page Finite Element Analysis using ETABS and STAAD software with stamped as-built plans. PE Dreux Seghers issued September 2, 2025 stamped report measuring beam deflection with laser level, refuting nine concerns from Ross's August 13 letter. PE Steve Fitzgerald---NASA Stennis Space Center Director of Facilities Engineering with forty years experience including twenty-four years as U.S. Navy Civil Engineer Corps Commander---issued September 19, 2025 professional opinion stating structure "exceeds residential standards by several orders of magnitude" using "aerospace and orbital dynamics methodology."

38. When Plaintiff Sumire showed plans on her phone to Polk on June 27, 2025, this was part of compliance effort by property co-owner attempting to satisfy City requirements. When Plaintiff Sumire delivered 180 pages of engineering documentation on July 9, 2025, this demonstrated family's good-faith compliance efforts while Plaintiff Yuri was medically incapacitated.

39. Despite three PE validations, CO remains denied without cure path since May 30, 2025 final inspection approval---depriving Plaintiffs of use of marital property.

## E. SHIFTING EXPLANATIONS & PRETEXTUAL DENIALS

40. **June 2025:** Required industrial sign for residential property---withdrawn days later.

41. **June 2025:** Required painting---withdrawn days later.

42. **June 2, 2025:** Plaintiff Sumire and insurance auditor Joevy met with Polk, Inspector Robert, and other Building Department staff requesting code citations supporting four correction items from Harbor's May 30, 2025 withholding of Certificate of Occupancy. None could locate code support. Defendants then abandoned four items and manufactured new requirements.

43. **June 2025:** Creel claimed "no plans delivered in December"---despite plans delivered by licensed professional Andrew Harwell three times at City's demand, and Inspector Robert receiving plans on site and inspecting footings and helical piles. Polk later admitted she "lost" them on June 27, 2025 when meeting with Plaintiff Sumire, then stated when shown plans "that's what she needs." Upon definitive proof plans were submitted, Creel pivoted to claiming structure "not built as per the plans"---false explanation, as structure was built per plans with any on-site adjustments made by engineer within permit scope.

44. **July 11, 2025:** Sent calculations to third-party engineer for fishing expedition seeking grounds for denial. Third party approved calculations July 20, 2025---fishing expedition failed.

45. **July 25, 2025:** After third-party approval, requested additional drawings.

## F. THE ICC-ES CERTIFIED POOL

46. Pool is iGUi Pools Tunis 1-C11, ICC-ES Listed ESR-4370---pre-manufactured fiberglass structure with pre-approved compliance paths eliminating placement permit requirements (only electrical/plumbing permits required). City received ICC-ES certification by email July 3, 2024, and approved variance for front yard placement at 1606 Beach Boulevard (Case No. 23-096-BZA under Section 23-4-4(B)(4)e3). Pool remains free-standing,

unanchored, without plumbing/electrical work---not "installed" under any definition. Yet June 30, 2025 Stop Work Order cited "swimming pool being installed without permit" as violation requiring armed police delivery.

---

## G. ADA VIOLATIONS

47. Plaintiff Yuri Petrini has documented neurological disabilities (narcolepsy) substantially limiting major life activities. These disabilities were known to Defendants through written ADA accommodation requests submitted in 2023, 2024, and 2025, litigation documents, formal letters, emails, medical documentation, and years of interactions spanning multiple properties and enforcement actions.

48. Plaintiff Yuri submitted written accommodation requests requesting advance notice and scheduled appointments for enforcement actions due to neurological disabilities requiring predictable schedules, written email communications rather than telephonic demands to accommodate processing needs and prevent miscommunication, and reasonable response time given medical conditions affecting information processing and, later, recovery from eye surgery. Each accommodation request was reasonable, cost-free to implement, and would have eliminated the confrontational enforcement pattern Defendants instead pursued.

49. Defendants ignored each written accommodation request. Rather than implementing the requested modifications to their enforcement procedures, Defendants excluded Plaintiff Yuri entirely through Abide's directive prohibiting staff contact. The June 30, 2025 armed police confrontation violated every requested accommodation---Defendants chose unscheduled tactical enforcement when accommodations specifically requested advance notice, deployed armed officers for civil code enforcement when accommodations specifically requested written communications, and created maximum confrontation when accommodations specifically requested reasonable processing time. This armed response caused severe trauma, sleep disruption, increased narcoleptic episodes, exacerbation of documented neurological condition, and required additional medical treatment beyond that already necessitated by July 7, 2025 eye surgery. Defendants conducted Sunday business communications on July 20, 2025 through Plaintiff's engineer despite knowing Plaintiff's processing limitations required written advance notice. Defendants systematically excluded Plaintiff from communications, sending requirements only to engineer rather than providing requested written communications directly.

50. Plaintiff Sumire witnessed armed confrontation and suffered trauma from Defendants' deliberate violation of spouse's disability accommodations. When Plaintiff Sumire attempted to advocate for disabled spouse and act on behalf of marital property interests

after Plaintiff Yuri was blocked from all communications, Defendants blocked her from communication channels, denied her CO application submission when she attempted to act as property co-owner on June 27, 2025, responded to her July 9, 2025 compliance delivery with criminal charges filed same day, and subjected her to armed confrontation on June 30, 2025. This pattern constitutes disability discrimination by proxy under the Americans with Disabilities Act---systematically punishing and retaliating against family member for attempting to advocate for disabled individual and for attempting to exercise independent property rights when disabled spouse was excluded from municipal processes.

## H. DAMAGES

51. Plaintiffs suffered complete loss of property use at 1606 Beach Boulevard without Certificate of Occupancy since May 30, 2025; over $300,000 in forced modifications and construction delays encompassing redesign fees, lost deposits, contract penalties, financing interest, unnecessary modifications, and contractor abandonments; over $500,000 in lost financing directly caused by Creel's false representations to financial institutions evaluating marital property; damaged professional relationships with engineers, inspectors, and contractors refusing continued work after armed confrontation and ex parte communications; severe health complications including Plaintiff Yuri's exacerbation of neurological condition, sleep disruption, increased narcoleptic episodes, emotional distress, and ongoing medical treatment arising from false criminal prosecution and armed tactical deployment, and Plaintiff Sumire's severe emotional distress from witnessing armed confrontation at family residence, trauma from false prosecution of spouse, psychological treatment for family trauma, loss of consortium, disruption of family life, forced separation between households, denial of spousal property rights through CO application rejection, and trauma from being blocked from advocating for disabled spouse and family property interests; reputational harm from criminal charges accessible in public records affecting business opportunities, bar admission, federal contracts, security clearances, client relationships, and family reputation; business destruction affecting international import operations involving Brazil, Colombia, Mexico, China, Italy, and India through forced relocation and credit impairment; and extreme two-household maintenance costs from May 30, 2025 to present creating severe financial strain on marital resources. All damages continue daily while Certificate of Occupancy remains denied, Stop Work Order remains maintained after criminal dismissal, and property rights of both Plaintiffs remain systematically obstructed.

## I. MONELL LIABILITY

52. **Municipal Liability Standard:** Municipalities are "persons" under § 1983 and liable when "action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).

53. **Official Policies:** The City implemented three official policies pursuant to which constitutional violations occurred: a) Brooke Vanover served as municipal court clerk during July 25, 2025 arraignment in Case CC-51719 while simultaneously employed in Building Department code enforcement---such concentration of enforcement and adjudicatory functions ensures the very department whose enforcement decisions are challenged controls the tribunal purporting to review those decisions, a due process violation inherent in the governmental structure itself; b) the City issued four separate Stop Work Orders at 1606 Beach Boulevard (Dec 1, 2024; Mar 13, 2025; Jun 30, 2025; Sep 19, 2025), the fourth persisting indefinitely after criminal dismissal without evidence---no other property received four orders, evincing a deliberate policy of retaliatory enforcement ratified through the City's deliberate choice to maintain the order notwithstanding judicial rejection of the underlying criminal charges; c) August 14, 2025 directive from Building Official Creel required that all permit communications proceed exclusively through City Attorney Ross at $150/hour, a written directive by department head with final policymaking authority systematically enforced through concerted attorney interposition. These constitute official municipal policy rather than ad hoc enforcement discretion---each implemented through written directive or systematic practice by officials with final decision-making authority whose choices constitute City policy.

54. **Customs:** Three customs create liability pursuant to practices that are "persistent and widespread" and "'so permanent and well settled as to constitute' custom or usage" under *Monell*, 436 U.S. at 691: a) the third Stop Work Order issued 34 days after federal lawsuit filing, coupled with Creel's recorded admission that Plaintiff "bypassed us and filed federal lawsuit," establishes custom of deploying code enforcement machinery as a weapon against citizens exercising First Amendment rights; b) coordination between City Attorneys Ross and Abide extracting $600,000 annually, with Engineer Pettry's sworn admission that "Ross hired us, not Building Department" and Chief Administrative Officer Weaver's unexplained failure to provide promised requirements after consulting Abide, proves custom wherein litigation attorneys arrogate to themselves both technical review functions and executive administrative control for fee extraction; c) City Attorney Ross exercises operational control over municipal court proceedings by directly retaining engineers for code enforcement prosecutions and coordinating prosecution strategy, establishing custom wherein the City Attorney's private firm controls judicial machinery for financial benefit rather than legitimate governmental purpose. It beggars reason to suppose that a Building Department employee fortuitously occupies dual positions as municipal court clerk adjudicating Building Department enforcement actions, or that four

Stop Work Orders targeting a single property---without precedent in the City's enforcement history---serve legitimate code compliance rather than constitute retaliatory machinery deployed following federal lawsuit filing.

55. **Final Policymakers - Structural Defects:** The City's governance structure concentrates final policymaking authority in officials whose coordinated actions create systematic constitutional violations: a) Building Official Jerry Creel simultaneously serves as Community Development Director and Historic Preservation Director, concentrating three distinct regulatory authorities against Plaintiff in a single official who also serves as sole administrative appeals authority reviewing his own enforcement decisions---this consolidation renders biased decision-making structurally inevitable, obviating any prospect of neutral administrative review; b) City Attorney Peter Abide holds final policymaking authority over litigation strategy and all legal policy pursuant to Resolution No. 327-17, which designates entity Currie Johnson & Myers as "City Attorney and Director of the Legal Department," rendering Abide's coordination of attorney gatekeeping, criminal prosecution machinery, and Enterprise operations official municipal policy rather than private attorney conduct subject to municipal supervision; c) City Attorney Hank Ross operates under Abide's supervision as subordinate counsel. Under the final policymaker doctrine developed from *Monell*, decisions by officials with final decision-making authority constitute official City policy because no higher municipal official reviews their determinations.

56. **Not Respondeat Superior:** A municipality "cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. The constitutional deprivations were effected by department heads holding multiple director positions, the chief legal officer controlling judicial and executive functions, and city attorneys implementing written policies and systematic customs pursuant to official municipal policy---not unauthorized acts of subordinate employees. The pattern of documented control demonstrates these are the City's own acts through authorized policymakers.

57. **Kennedy Pattern:** *Kennedy v. City of Biloxi*, No. 1:15-cv-348-HSO-JCG (S.D. Miss. 2015), established this Court previously found the City engaged in systematic constitutional violations requiring federal intervention. Notwithstanding the March 2016 settlement mandating reforms, the City substituted one machinery of constitutional deprivation for another, demonstrating a custom wherein only active federal supervision compels constitutional compliance and systematic violations resume through alternative mechanisms once oversight concludes.

---

**J. CONSCIOUSNESS OF GUILT - THE LOST PLANS ADMISSION**

58. **June 27, 2025 Meeting:** Plaintiff Sumire Maeda and insurance auditor Joevy met with Creel and Polk at Building Department. Plans Examiner Polk admitted to Plaintiff Sumire Maeda and insurance auditor Joevy that she "lost the December stamped plans and could not locate them." When shown these plans on Plaintiff Sumire's phone, Polk confirmed "that's what she needs"---the plans demonstrating compliance.

59. These were the same plans delivered by licensed professional Andrew Harwell no less than three times at City's demand for multiple copies. Inspector Robert met with engineer Terry Moran on site, inspected footings and helical piles, and himself received the plans from Harwell. Defendant Creel later denied plans were ever submitted---contradicting Inspector Robert's receipt. Upon definitive proof of submission, Defendant Creel pivoted to claiming structure "not built as per the plans"---a second false claim, as any on-site adjustments were made by the engineer within permit scope.

60. This admission directly contradicts Creel's June 30 Stop Work Order claim that "unfinished deck structure was not built according to engineered drawings"---drawings Polk just admitted she lost and couldn't review.

61. Same day meeting: When Plaintiff Sumire attempted submitting Certificate of Occupancy application form (available on City's website), both Polk and Creel denied her, stating "an application is not required" despite form's existence on City's own website. Denial of CO application to property co-owner demonstrates consciousness of guilt through obstruction of spousal advocacy.

62. Insurance auditor witnessed City's contradictory positions firsthand---creating additional evidence of City's documented inconsistencies affecting both Plaintiffs' property interests.

63. **Next day (June 30):** After being shown the plans demonstrating compliance, armed officers delivered Stop Work Order stating "no plans submitted"---the opposite of what Polk admitted to Plaintiff Sumire previous day.

64. *Napue v. Illinois* recognized selective disclosure proves consciousness of obligation and deliberate violation. 360 U.S. 264, 284 (1959). Pattern here parallels *Napue*: Creel's 10:30 AM email acknowledged engineering package without mentioning violations allegedly witnessed at 10:00 AM; criminal summons issued July 9, 2025 before affidavits executed July 10, 2025; July 25, 2025 arraignment recordings capture admission prosecution initiated because Plaintiff "bypassed us and filed federal lawsuit." Each selective disclosure proves deliberate choice to conceal favorable information.

---

## V. CAUSES OF ACTION

### COUNT I - PROCEDURAL DUE PROCESS VIOLATION (Property Rights - Certificate of Occupancy)

**42 U.S.C. § 1983 - Fourteenth Amendment**
**Against: All Defendants**

65. Plaintiffs incorporate by reference paragraphs 1-64 and all allegations in the Preliminary Statement and Statement of Facts.

66. Plaintiffs possess protected property interest under *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Procedural due process protections apply when state law creates "legitimate claim of entitlement" to the benefit—"more than an abstract need or desire for it" and "more than a unilateral expectation of it." *Id.*

67. Mississippi building codes create such entitlement. IRC Section R114.2 mandates Certificate of Occupancy "shall" issue when all required inspections are approved. All inspections passed May 30, 2025. Three independent Professional Engineers validated structural adequacy. No written deficiencies identified. This constitutes legitimate claim based on objective statutory criteria satisfied, not unilateral expectation as in *Roth*.

68. *Roth*'s holding turned on discretionary nature of university's renewal decision where contract "secured absolutely no interest in reemployment." 408 U.S. at 578. Certificate issuance here is ministerial, not discretionary. Once building codes' objective requirements are met, Certificate issuance becomes ministerial act where officials lack discretion to deny. Mississippi Code and IRC R114.2 create enforcement scheme with defined standards, unlike *Roth*'s unfettered discretion. State law thus "secures certain benefits and supports claims of entitlement to those benefits." *Id.* at 577.

69. Plaintiffs possess protected property interests in 1606 Beach Boulevard, Certificate of Occupancy, Building Permit #2024-1847, and statutory entitlement under Biloxi Land Development Ordinance § 23-2-4(O). As alleged in ¶¶8-12, Defendants deprived these interests through procedures failing every requirement of *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).

70. Defendants' notice manipulation establishes a pattern violating *Mullane*'s requirement that notice be "reasonably calculated, under all the circumstances, to apprise interested parties" of pending deprivations. *Id.* at 314. Where written requirements would enable compliance, Defendants provide none (¶¶8, 12). Where email would suffice, Defendants deploy armed police (¶11). Where local business addresses appear on City records, Defendants use out-of-state addresses. This constitutes "a mere gesture"---"fiction deny[ing] the fair play that can be secured only by a pretty close adhesion to fact." *Id.* at 315, 320 (quoting *McDonald v. Mabee*, 243 U.S. 90, 91 (1917)).

71. Building Official Creel should facilitate compliance but manufactures violations. Like *Mullane*'s trustee who "becomes [beneficiaries'] adversary," *id.* at 316, Creel became an active adversary through his false criminal affidavits (¶22) and systematic obstruction (¶¶9-10, 31). Plaintiffs' contact information is "at hand." *Mullane*, 339 U.S. at 318. When

superior notice means are available, "the reasons disappear for resort to means less likely" to inform. *Id.* Would these procedures "satisfy a prudent man of business"? *Id.* at 319. No business denies applications without explanation (¶8), blocks inquiries (¶9), refuses cure requirements (¶12), then claims customers failed to exhaust remedies.

72. Defendants' procedures are more than "a feint." *Id.* at 320. Orders stating "call to discuss" while maintaining communication bans are theatrical compliance (¶¶9, 11). Stop Work Orders failing to state "reasons" or "conditions for resumption" as IRC R114.2 mandates are legal pretense (¶11). As of today, no Certificate of Occupancy, no written requirements, property unusable despite three Professional Engineer validations (¶37). Deprivation continues without notice, hearing, or cure opportunity.

73. *Barry v. Barchi* establishes governmental interest justifying pre-deprivation delay evaporates post-deprivation: "Once suspension has been imposed, the trainer's interest in a speedy resolution of the controversy becomes paramount." 443 U.S. 55, 66 (1979). Even assuming City's claimed safety interest justified May 30, 2025 Certificate denial without immediate hearing, that interest cannot justify five months of continued denial without hearing or written requirements. Once denial occurred, Plaintiff's interest in speedy resolution became paramount. Five months exceeds *Barry*'s condemned 15-day suspension by factor of ten.

74. *Barry* condemned procedures where "it is as likely as not that [affected persons] would have no opportunity to put the State to its proof until they have suffered the full penalty imposed." 443 U.S. at 66. If *Barry*'s statutory scheme allowing 15-day suspension to potentially expire before hearing violated due process, City's complete absence of any hearing mechanism for 150-plus-day denial constitutes categorical constitutional violation. Not probable, not likely, but mathematically certain that full penalty suffered before any opportunity for hearing.

---

**COUNT II - PROCEDURAL DUE PROCESS VIOLATION (Stop Work Orders - IRC R114.2)**

**42 U.S.C. § 1983 - Fourteenth Amendment**
**Against: Defendants Creel, Harbor, Polk, Busby, City of Biloxi**

75. Plaintiffs incorporate by reference paragraphs 1-64 and all allegations in the Preliminary Statement and Statement of Facts.

76. Defendants systematically issued Stop Work Orders failing IRC R114.2 requirements mandating written orders state reasons for issuance and conditions under which work is authorized to resume. As alleged in ¶14, Harbor issued a December 1, 2024 order citing no code violations. As alleged in ¶13, Busby issued a March 28, 2025 order accompanied

by warrantless equipment entry and seizure. As alleged in ¶11, Defendants delivered a June 30, 2025 order via armed police without stating reasons or resumption conditions required by IRC R114.2.

77. This pattern of deficient orders deprived Plaintiffs of property rights without required procedural protections, forcing work stoppages without notice, hearing, or cure opportunity.

---

## COUNT III - SUBSTANTIVE DUE PROCESS VIOLATION (False Criminal Prosecution)

**42 U.S.C. § 1983 - Fourteenth Amendment**
**Against: Defendant Creel, City of Biloxi**

78. Plaintiffs incorporate by reference paragraphs 1-64 and all allegations in the Preliminary Statement and Statement of Facts.

79. As alleged in ¶¶21-23, Defendant Creel executed four sworn criminal affidavits falsely claiming he "personally observed" Plaintiff Yuri Petrini at 10:00 AM at 1606 Beach Boulevard when documentary evidence establishes Plaintiff Yuri was incapacitated from eye surgery in California (¶20). The criminal summons was issued July 9, 2025---before the supporting affidavits were executed July 10, 2025. Creel's own 10:30 AM email confirmed receipt of Plaintiff Sumire's compliance documentation but made no mention of violations supposedly witnessed thirty minutes earlier.

80. "A conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). This principle applies "irrespective of good faith or bad faith" of state representatives. *Id.*

81. Creel's four affidavits sworn July 10, 2025 claimed he "personally observed" Plaintiff at 1606 Beach Boulevard at 10:00 AM. Medical records prove Plaintiff was in California recovering from eye surgery. Creel's own 10:30 AM email acknowledged engineering package without mentioning violations allegedly witnessed thirty minutes earlier. Municipal court dismissed Case CC-617-19 on September 19, 2025 after prosecution failed to produce evidence, proving affidavits were sole basis for charges.

82. This false prosecution deprived Plaintiffs of liberty interests without due process, causing severe harm to family reputation, emotional distress, and ongoing damages (¶51).

---

## COUNT IV - FIRST AMENDMENT RETALIATION (Protected Speech and Petition)

**42 U.S.C. § 1983 - First Amendment**
**Against: All Defendants**

83. Plaintiffs incorporate by reference paragraphs 1-64 and all allegations in the Preliminary Statement and Statement of Facts.

84. As alleged in ¶¶16-17, Plaintiffs engaged in protected First Amendment activities by filing a federal civil rights lawsuit on June 6, 2025 and an FBI report on June 30, 2025.

85. Defendants responded with adverse actions that would chill an ordinary person from exercising constitutional rights: armed police delivery of Stop Work Order fifty minutes after the FBI report (¶18); false criminal affidavits thirty-four days after federal lawsuit filing (¶22); communication ban blocking administrative remedies (¶9); attorney gatekeeping requirements (¶31); and maintenance of all restrictions after criminal dismissal (¶28).

86. Temporal proximity and Defendant Creel's recorded admissions at arraignment---"bypassed us and filed federal lawsuit" and "flooded us with public records requests" (¶25)---establish the causal connection between protected activity and adverse actions.

87. This retaliation caused irreparable harm to Plaintiffs' constitutional rights and continues daily.

---

## COUNT V - EQUAL PROTECTION VIOLATION (Class-of-One Selective Enforcement)

**42 U.S.C. § 1983 - Fourteenth Amendment**
**Against: All Defendants**

88. Plaintiffs incorporate by reference paragraphs 1-64 and all allegations in the Preliminary Statement and Statement of Facts.

89. *Yick Wo v. Hopkins* established that facially neutral laws become unconstitutional when "applied and administered by public authority with an evil eye and an unequal hand." 118 U.S. 356, 373-374 (1886). The Court recognized that discriminatory enforcement violates equal protection regardless of whether discrimination appears in statutory text or administrative application.

90. Here, Defendant Creel's recorded admission at municipal court arraignment that criminal prosecution followed because Plaintiff "bypassed us and filed federal lawsuit" and "flooded us with public records requests" provides direct evidence of discriminatory motive. This recorded confession establishes stronger proof than the statistical patterns *Yick Wo* required for inferring discriminatory intent from disparate outcomes.

91. Where *Yick Wo* relied on patterns showing two hundred Chinese laundry operators denied permits while eighty non-Chinese operators received approval, this case presents explicit admission of retaliatory motive. The evidence here exceeds *Yick Wo*'s proof requirements: direct confession of discriminatory intent rather than statistical inference, documented temporal sequence showing criminal prosecution thirty-four days after federal lawsuit filing, physical impossibility evidence through medical records proving false affidavit claims, and continuing retaliation through Stop Work Order maintenance after criminal dismissal.

92. *Yick Wo* also condemned regulations conferring "not a discretion to be exercised upon consideration of circumstances of each case, but a naked and arbitrary power to give or withhold consent," acknowledging "neither guidance nor restraint." 118 U.S. at 369. Biloxi's enforcement exhibits identical characteristics. No written requirements provided despite five months of requests. IRC R114.2 mandates Certificate "shall" issue when inspections pass, yet all inspections passed May 30, 2025 and Certificate remains denied without stated basis. Three Professional Engineer validations ignored without technical rebuttal. Stop Work Order maintained after criminal dismissal demonstrates enforcement divorced from legitimate safety concerns.

93. While approving unpermitted construction at 283 Bohn Street with Defendant Creel personally approving fence erected on city property without permit or historic review, Defendants immediately enforced against Plaintiffs after June 6, 2025 federal lawsuit filing while ignoring identical violations by others.

94. The pattern of selective enforcement detailed in Sections A and B demonstrates disparate treatment targeted the family unit based on exercise of federal constitutional rights, violating equal protection guarantees.

---

**COUNT VI - AMERICANS WITH DISABILITIES ACT VIOLATIONS (Failure to Accommodate and Discrimination by Proxy)**

**42 U.S.C. § 12132 - Title II ADA**
**Against: All Defendants**

95. Plaintiffs incorporate by reference paragraphs 1-64 and all allegations in the Preliminary Statement and Statement of Facts, particularly ¶¶47-50 (ADA Violations).

96. As detailed therein, Plaintiff Yuri Petrini is a qualified individual with documented neurological disabilities (narcolepsy) substantially limiting major life activities. Defendants had actual knowledge of these disabilities through written ADA accommodation requests submitted in 2023, 2024, and 2025. Biloxi's building permit and Certificate of Occupancy processes constitute covered programs under Title II.

97. Plaintiff Yuri requested reasonable, cost-free accommodations including advance notice, scheduled appointments, and written email communications. Defendants systematically ignored each request and instead: deployed armed police for unscheduled tactical enforcement (¶¶11, 18), conducted Sunday business communications (¶24), and excluded Plaintiff Yuri entirely through communication ban (¶9)---violating every requested accommodation.

98. When Plaintiff Sumire attempted to advocate for her disabled spouse and exercise independent property rights, Defendants blocked her communications (¶9), denied her Certificate of Occupancy application (¶10), responded to her compliance delivery with criminal charges (¶21), and subjected her to armed confrontation (¶11)---constituting discrimination by proxy against a family member advocating for a disabled individual.

## COUNT VII - CONSPIRACY TO DEPRIVE CIVIL RIGHTS

**42 U.S.C. §§ 1983, 1985(3)**
**Against: Defendants Creel, Harbor, Polk, Busby, Abide, Currie Johnson & Myers, City of Biloxi**

99. Plaintiffs incorporate by reference paragraphs 1-64 and all allegations in the Preliminary Statement and Statement of Facts.

100. The temporal coordination detailed throughout the Statement of Facts, particularly ¶¶16-28, reveals Defendants reached an agreement or understanding to deprive Plaintiffs of constitutional rights through concerted action rather than isolated acts.

101. The conspiracy's objective was to: deny property rights without due process (COUNT I); retaliate for protected First Amendment activity (COUNT IV); fabricate criminal charges to harm reputation (COUNT III); and exclude disabled individuals from public services (COUNT VI).

102. The conspiracy succeeded in depriving Plaintiffs of property rights, liberty interests, equal protection, and ADA accommodations, causing all damages described in ¶51 which continue daily.

## COUNT VIII - MUNICIPAL LIABILITY (Monell - Policy, Custom, Final Policymaker)

**42 U.S.C. § 1983**
**Against: City of Biloxi**

103. Plaintiffs incorporate by reference paragraphs 1-64 and all allegations in the Preliminary Statement and Statement of Facts, particularly ¶¶52-57.

104.     As detailed therein, the City of Biloxi is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) because:

105.     **Final Policymakers:** Defendant Creel serves as Building Official, Director of Community Development, and sole appeals authority, constituting a final policymaker whose decisions represent official City policy (¶55). This dual-hat structure creates a systemic procedural due process violation by requiring property owners to appeal Creel's enforcement decisions to Creel himself, eliminating neutral review and rendering administrative remedies arbitrary and capricious.

106.     **Official Policies:** The City implemented three official policies pursuant to which constitutional violations occurred (¶53), including Resolution No. 327-17 establishing Abide and Currie Johnson & Myers as City Attorney and Director of Legal Department (¶4), making their communication ban and obstruction official City policy (¶9).

107.     **Customs:** The City maintains customs of denying due process through systematic failure to provide written reasons, hearings, or cure opportunities before enforcement or criminal prosecution (¶54).

108.     **Pattern Requiring Federal Intervention:** As demonstrated by *Kennedy v. City of Biloxi*, this Court previously found the City engaged in systematic constitutional violations requiring federal intervention. Despite the March 2016 settlement requiring reforms, the City escalated to deploying armed police against disabled citizens and families (¶¶11, 18, 47-50).

---

## COUNT IX - REGULATORY TAKING WITHOUT JUST COMPENSATION

**U.S. Const. amend. V - Takings Clause (via Fourteenth Amendment)**
**Against: City of Biloxi**

109.     Plaintiffs incorporate by reference paragraphs 1-64 and all allegations in the Preliminary Statement and Statement of Facts.

110.     In the alternative to due process claims, Defendants' conduct constitutes regulatory taking requiring just compensation under the Fifth Amendment as applied through the Fourteenth Amendment.

111.     *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), established framework examining economic impact, interference with investment-backed expectations, and character of governmental action. The character of governmental action distinguishes legitimate regulation from pretextual appropriation. *Id.* at 124.

112.    *Penn Central*'s framework assumes good faith public welfare regulation. When enforcement is demonstrably pretextual, retaliatory, and revenue-driven, the character factor weighs decisively for finding taking regardless of other factors.

113.    Multiple indices prove pretext here. Three Professional Engineers validated structure "exceeds residential standards by several orders of magnitude," yet Certificate denied without written deficiencies. Criminal prosecution filed thirty-four days after federal lawsuit filing; attorney gatekeeping imposed five days after prosecution initiated. Neighbor's unpermitted fence received Creel's personal approval while Plaintiff's engineered structure denied for five months. Approximately $566,000 extracted annually through building matters; attorney gatekeeping converts free service into billable consultations.

114.    *Penn Central*'s "parcel as a whole" doctrine typically favors government by preventing conceptual severance that would artificially isolate regulated portions from unregulated value. *Id.* at 130-131. In *Penn Central*, the Court examined Grand Central Terminal's continuing railroad operations and office leases when evaluating air rights restrictions, noting no taking occurs "as long as [owner] can earn reasonable return." *Id.* at 138.

115.    Here, examining 1606 Beach Boulevard as a whole reveals complete rather than partial deprivation. The structure stands one hundred percent complete since May 30, 2025. All inspections passed: electrical, mechanical, plumbing, footing, foundation, nailing, rough-in, and pre-final. Three independent Professional Engineers validated structural adequacy. Yet zero beneficial use is permitted. The property cannot be occupied, sold, rented, or financed.

116.    Where *Penn Central*'s Grand Central Terminal retained substantial economic use through continuing operations, examining this property as a whole shows total deprivation. Zero occupancy equals zero return, exceeding *Penn Central*'s threshold even under its deferential regulatory standard.

117.    Complete deprivation of property use at 1606 Beach Boulevard persists since May 30, 2025 despite all inspections passing and three independent Professional Engineer validations. Property remains uninsurable, unusable, cannot be sold, rented, or financed. Certificate denial following final inspection approval, combined with indefinite Stop Work Order maintenance after criminal dismissal, deprives Plaintiffs of all economically beneficial use.

118.    Defendants' pretextual enforcement for retaliatory and revenue purposes rather than legitimate safety regulation constitutes taking requiring just compensation.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter declaratory judgment that Defendants violated Plaintiffs' constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments and Title II of the Americans with Disabilities Act;

B. Issue preliminary and permanent injunctions PROHIBITING Defendants from:

1. Denying Certificate of Occupancy applications without providing specific written reasons citing code violations with section numbers;

2. Denying Certificate of Occupancy applications without providing written conditions that must be satisfied for approval;

3. Maintaining Stop Work Orders without stating in writing the specific reasons for issuance and conditions under which work is authorized to resume as required by IRC R114.2;

4. Issuing Stop Work Orders, criminal charges, or other enforcement actions without providing prior written notice and opportunity to cure, except in genuine emergency circumstances;

5. Requiring attorney representation or attorney approval as condition for processing building permits, Certificate of Occupancy applications, or routine Building Department communications;

6. Blocking Plaintiffs' direct communications with Building Department staff regarding permit and Certificate of Occupancy matters;

7. Deploying armed police officers for delivery of civil code enforcement notices absent genuine emergency or public safety threat;

8. Refusing to accept or process Certificate of Occupancy applications from either Plaintiff as property co-owners;

9. Denying ADA accommodation requests for advance written notice, scheduled appointments, and written communications;

10. Retaliating against Plaintiffs for filing federal civil rights actions, FBI reports, public records requests, or other protected First Amendment activities;

C. Award compensatory damages in amounts to be determined at trial through discovery and expert testimony, including but not limited to:

- Complete loss of beneficial use and equity lock of property at 1606 Beach Boulevard from May 30, 2025 through present and continuing;

- Construction delays, forced modifications, redesign fees, lost deposits, contract penalties, financing interest costs, unnecessary modifications, and contractor abandonments;

- Lost financing and impairment of property value caused by Defendants' false representations to financial institutions;

- Damaged professional relationships with engineers, inspectors, and contractors;

- Medical expenses for Plaintiff Sumire's related to physical and psychological damage resulting from armed confrontation at family residence and false criminal prosecution;

- Two-household maintenance costs from May 30, 2025 through present and continuing, creating severe financial strain on marital resources;

- Business losses including destruction of international import operations, forced business relocation, credit impairment, and loss of commercial relationships;

- Reputational harm from criminal charges in public records affecting professional licensing, bar admission eligibility, federal contract opportunities, security clearance maintenance, and client relationships;

- Loss of consortium, disruption of family life, forced separation between households, and denial of spousal property rights;

- Emotional distress, humiliation, and mental anguish suffered by both Plaintiffs;

- All other economic and non-economic damages to be proven through discovery and at trial;

D. Award punitive damages against Defendants Creel, Harbor, Polk, Busby, and Abide individually in amounts sufficient to punish and deter conduct undertaken with malicious intent or reckless disregard for Plaintiffs' clearly established constitutional rights, including: filing sworn affidavits containing statements known to be false; deploying armed police for civil code enforcement without exigent circumstances; maintaining enforcement orders after judicial rejection of underlying criminal charges; blocking administrative remedies while simultaneously claiming Plaintiffs failed to exhaust such remedies; and systematically denying disability accommodations after written requests;

E. Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

F. Award pre-judgment and post-judgment interest as allowed by law;

G. Grant such other and further relief as this Court deems just and proper.

PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Respectfully submitted this *1st* day of *december*

24

Respectfully submitted at this _1ˢᵗ_ day of _decenber_ , 2025.

_____

**Yuri Petrini, Pro Se**
Tel: (305) 504-1323
yuri@megalopolisms.com

_____

**Sumire Maeda, Pro Se**
Tel: (305) 497-9133
sumire@megalopolisms.com

929 Division Street, Biloxi, MS 39530

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I filed the foregoing in person with the Clerk of Court, which will send notification of such filing to all counsel of record via the CM/ECF system.

Dated this 1st day of december , 2025.

_____
Yuri Petrini